**PENNWALT CORPORATION,**
**Appellee/Cross-Appellant,**

v.

**AKZONA INCORPORATED and Armak Company, Appellants/Cross-Appellees.**

**Appeal Nos. 83–1417, 84–505.**

United States Court of Appeals, Federal Circuit.

Aug. 10, 1984.

Phillip H. Mayer, Chicago, Ill., argued for appellants. With him on the brief were Gordon R. Coons and Stephen B. Heller, Chicago, Ill.

John G. Mulford, Wilmington, Del., of counsel.

Arthur H. Seidel, Philadelphia, Pa., argued for appellee. With him on the brief was Daniel A. Monaco, Philadelphia, Pa., of counsel.

Before KASHIWA, BENNETT and MILLER, Circuit Judges.

JACK R. MILLER, Circuit Judge.

Akzona, Incorporated, and its subsidiary, Armak Company (both hereafter referred to as "Armak"), appeal from the decision of

the United States District Court for the District of Delaware ("district court")[1] that U.S. Patent No. 4,107,292[2] ("Nemeth patent") is invalid and that Pennwalt Corporation ("Pennwalt") is not liable under contract and equity counterclaims of Armak based on state law. Pennwalt cross-appeals the district court's decision denying attorney fees. We affirm.

## BACKGROUND

Methyl and ethyl parathion are well known insecticides, which are highly toxic to insects as well as to humans. Due to their toxicity, Pennwalt developed a microencapsulated formulation of these insecticides which is less toxic to humans and maintains insecticidal effectiveness for long periods of time. The encapsulating material utilized in this formulation is a polymer skin of cross-linked polyamide-polyurea which is disclosed in Pennwalt's U.S. Patent No. 3,959,464[3] to DeSavigny.

Pennwalt, which marketed the microencapsulated insecticide under the trademark PENNCAP M, preferred to suspend it in water so that it could be dispersed with a spraying device; however, Pennwalt discovered that the microcapsules tended to settle out of the suspension and, once settling occurred, it was difficult to redisperse the microcapsules so they could be sprayed in the proper concentration. To overcome this problem, Pennwalt sought technical assistance from a number of specialty chemical companies, including Armak, in February, 1971. In April, 1971, Armak supplied Pennwalt with four sample formulations of microencapsulated methyl parathion suspended in water, which Armak found to be satisfactory. One of these formulations, which Armak found to achieve the best results, contained xanthan gum as a suspending agent ("Nemeth invention"). Ar-

1. Reported at 570 F.Supp. 1097, —— USPQ ——.

2. Issued August 15, 1978, on application No. 769,362, filed February 16, 1977, for "Stable Water Dispersions of Encapsulated Parathion." Application No. 769,362 is a continuation of application No. 457,152, filed April 1, 1974 ("parent application"), and now abandoned,

which is a continuation-in-part ("CIP") of application No. 230,935, filed March 1, 1972 ("grandparent application"), and now abandoned.

3. Issued May 25, 1976, on application No. 149,816, filed June 3, 1971, for "Microencapsulated Methyl and Ethyl Parathion Insecticide in Aqueous Carrier."

mak did not advise Pennwalt that the preferred suspending agent was xanthan gum, but, instead, told Pennwalt to order the suspending agent from Armak under the code RD–4237.

Between July 18 and August 7, 1972, Pennwalt's Bryan, Texas, plant manufactured six batches of approximately 4300 gallons of an aqueous suspension of encapsulated methyl parathion containing xanthan gum acquired from Armak. A sample of each batch was subjected to chemical assay, toxicology, and cricket bioassay tests and, after passing these tests, the batches were released for sale.[4] On August 22, 1972, Pennwalt sold 400 gallons of the suspension to Helena Chemical Company ("Helena") for $900. Between August 24 and September 19, 1972, Borden Company's distributor, Smith-Douglas ("Borden"), bought 1,015 gallons of suspension from Pennwalt for $4,567.50. Another 5 gallons of suspension were sold to Stauffer Chemical Company for $22.50 on August 29, 1972. With the exception of the last, these sales were made to distributors who sold to farmers. Pennwalt's aqueous suspension of encapsulated methyl parathion and xanthan gum was distributed under a "temporary permit," issued pursuant to an Environmental Protection Agency ("EPA") regulation (40 C.F.R. § 162.17 revised January 1, 1972),[5] which provided that such permits "will be issued only for bona fide *experimental* programs under the supervision of qualified persons." (Emphasis added.)

Prior to Armak's development of the Nemeth invention, the predecessors of Armak and Pennwalt executed a Product Development Agreement ("PDA") for the cooperative development of pesticides. Under this agreement, Armak's predecessor, Armour Industrial Chemical Co., agreed to grant exclusive licenses to Pennwalt's predecessor, Pennsalt Chemicals Corporation, on "[a]ny United States patents ob-

tained on chemical use or composition of matter inventions on chemicals or formulations submitted to PENNSALT." After Armak discovered the advantage of using xanthan gum in an aqueous suspension of encapsulated methyl parathion, there was a series of communications between Armak and Pennwalt regarding the licensing of the Nemeth invention.[6] It was in October, 1971, that Pennwalt first learned that Armak wanted compensation for the development of the Nemeth invention. On August 4, 1972, Armak's Director of Marketing, Roy deVries, wrote to Robert Toth, the General Manager of Pennwalt's Agchem-Decco Division, suggesting that the parties "should sit down and come to some agreement" on royalty terms for the use of RD–4237. On August 11, 1972, Toth responded that technical and manufacturing people would soon report their evaluation of RD–4237 and that "we should sit down and discuss some type of an agreement as soon as we determine the future of your product." In a subsequent meeting with Armak representatives on March 27, 1973, Toth expressed his unwillingness to discuss a royalty agreement until the patent status of the Nemeth invention was determined. On August 3, 1973, Pennwalt had the Kelco Company determine the identity of RD–4237 by reverse engineering, and after learning that RD–4237 was xanthan gum, Pennwalt elected to discontinue buying this suspending agent from Armak.

The Nemeth patent issued on August 15, 1978, and, fearing that it would be sued for patent infringement after further negotiations failed to lead to a royalty agreement, Pennwalt brought an action for declaratory judgment that the Nemeth patent was invalid and not infringed. In its answer, Armak denied Pennwalt's allegation of invalidity and counterclaimed for damages for infringement of the Nemeth patent. Armak also sought damages under state

---

**4.** The district court found that the destruction of sales records permitted it to determine only the disposition of 1220 gallons of the 4300 gallons of suspension.

**5.** The "temporary permit" regulations were promulgated under authority of the Federal Insecti-

cide, Fungicide, and Rodenticide Act ("FIFRA"). 7 U.S.C. § 135.

**6.** These discussions are more fully summarized in the district court's opinion. *Pennwalt Corporation v. Akzona Inc.,* 570 F.Supp. 1097, 1111–12, —— USPQ ——, —— (D.Del.1983).

law, asserting that Pennwalt had breached the PDA and an implied agreement to pay a royalty and that Pennwalt had been unjustly enriched.

The district court held that the claims of the Nemeth patent[7] were not entitled to the filing date of the grandparent application under 35 U.S.C. § 120 (1982),[8] because the grandparent application disclosed only polyamide encapsulated insecticides—not the polyurea and cross-linked polyamide-polyurea encapsulated insecticides set forth in the claims of the Nemeth patent. The district court's holding that the claims of the Nemeth patent were not entitled to the filing date of the grandparent application under 35 U.S.C. § 120 was also based on its conclusion that the grandparent application did not meet the enablement and best mode requirements of the first paragraph of 35 U.S.C. § 112 (1982). Accordingly, the claims of the Nemeth patent were only accorded the April 1, 1974, filing date of the parent application.

As to Pennwalt's sales of aqueous suspensions of encapsulated methyl parathion and xanthan gum and the use of these suspensions by farmers, the district court found that these were all made prior to April 1, 1973. The district court also found that these sales and uses under the EPA

"temporary permit" were not experimental because: a Government agency's labeling a use or sale "experimental" does not necessarily make it "experimental" under the patent laws; the data gathered by Pennwalt in tests conducted under the temporary permit were not commensurate in scope with the claims of the Nemeth patent; Armak did not restrict Pennwalt's use of RD–4237; Armak did not require Pennwalt to report back any test results; Pennwalt's primary motive in obtaining the temporary permit was commercial; and any experimentation by Pennwalt was not under Armak's control. Accordingly, the district court held the Nemeth patent invalid, because the claimed invention was in "public use" and "on sale" under 35 U.S.C. § 102(b) (1982).[9]

The district court also held that Pennwalt was not liable to Armak under the PDA, because the PDA covered the development of active pesticides rather than inert ingredients, like xanthan gum, in pesticides. Also, Armak's conduct indicated to the district court that the PDA did not apply, because Armak failed to comply with the PDA's requirements that Pennwalt be advised of the applications corresponding to the Nemeth patent and the identity of RD–4237.

---

7. Claim 1, which the district court found to be the broadest claim of the Nemeth patent, is illustrative:

    1. An insecticidal composition consisting essentially of an aqueous dispersion of:

    (a) from about 1% to about 40% by weight of said composition of capsules of a member of the group consisting of a phosphoromonothioate and a phosphorodithioate insecticide encapsulated in a skin selected from the group consisting of a polyamide, a polyurea, and a mixed polyamide-polyurea cross-linked with a cross-linking agent selected from the group consisting of a polyalkylene polyamine and a polyfunctional isocyanate;

    (b) from about 0.1% to about 0.5% by weight of said composition of a xanthan gum dispersant for said capsules; and

    (c) balance water.

8. 35 U.S.C. § 120 (1982) provides:

§ 120. Benefit of earlier filing date in the United States

    An application for patent for an invention disclosed in the manner provided by the first

paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

9. 35 U.S.C. § 102(b) (1982) provides:

§ 102. Conditions for patentability; novelty and loss of right to patent

    A person shall be entitled to a patent unless—

    . . . .

    (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

The district court further held that Pennwalt was not liable on a theory of breach of an implied contract or unjust enrichment because, when Pennwalt sought help in solving its dispersion problem, it was seeking free technical service, which is a common practice in the chemical industry; that, having failed to request compensation until after the technical service was completed, Armak could not recover for performance of that service. Although the district court acknowledged that Armak and Pennwalt did discuss the payment of royalties after Armak's technical service work was completed, the court concluded that these discussions did not give rise to any liability, because Pennwalt only agreed to pay royalties if a valid patent issued on the Nemeth invention.

The district court refused to award Pennwalt attorney fees, because Armak had a good faith belief that the Nemeth patent was valid, and this case was, therefore, not "exceptional" under 35 U.S.C. § 285 (1982).[10]

### ISSUES

(1) Whether the district court's holding that the Nemeth patent is invalid is correct; (2) Whether the district court correctly held that Pennwalt was not liable under Armak's state law counterclaims; (3) Whether the district court abused its discretion in denying an award of attorney fees.

### OPINION

1. *Validity of the Nemeth Patent*

In assessing the validity of the Nemeth patent, we must first decide whether the district court's holding that the Nemeth patent is entitled to only the April 1, 1974, filing date of the parent application, instead of the March 1, 1972, filing date of the grandparent application, is correct. *Litton Systems, Inc. v. Whirlpool Corp.,*

728 F.2d 1423, 1438, 221 USPQ 97, 106 (Fed.Cir.1984).

In *Litton v. Whirlpool,* 728 F.2d at 1438–40, 221 USPQ at 106–07, this court declined to accord a patent, which issued from a CIP application, the filing date of its parent application (under 35 U.S.C. § 120), because the issuance of a patent from a CIP application, filed in response to a PTO "new matter rejection," [11] estops the patentee from arguing that the PTO's rejection was erroneous. Specifically, Litton was precluded from arguing that claim limitations in the patent which were the basis for a "new matter rejection" in the parent application are inherent in the disclosure of the parent application, because Litton had acquiesced in the "new matter rejection" by filing a CIP application which ultimately issued as a patent. *Id.* Having acquiesced in the PTO's position that the claim limitations constituted new matter with respect to the disclosure of the parent application, the claims of Litton's patent were not accorded the filing date of the parent application which was needed to overcome an "on sale" bar under 35 U.S.C. § 102(b). *Id.*

The filing of a CIP application to overcome a PTO rejection does not, however, give rise to an irrebuttable presumption of acquiescence in the rejection. Whether claims are entitled to the CIP application's filing date or that of a parent application becomes important when an intervening event occurs which will invalidate the claims under 35 U.S.C. § 102 if they are only accorded the latter filing date. As with any other basis for asserting patent invalidity, Pennwalt has the burden of overcoming the presumption of validity under 35 U.S.C. § 282 (1982) by clear and convincing evidence that the filing of a CIP application and its issuance as a patent

---

**10.** 35 U.S.C. § 285 (1982) provides:

§ 285. Attorney fees

The court in exceptional cases may award reasonable attorney fees to the prevailing party.

**11.** Claims which are amended with limitations unsupported by the original disclosure are re-

jected under 35 U.S.C. § 112 (first paragraph) as lacking support in the specification, while such amendments to the abstract, specification, and drawings are objected to as being drawn to *new matter. In re Rasmussen,* 650 F.2d 1212, 211 USPQ 323 (CCPA 1981).

constituted an acquiescence by Armak in the PTO's rejection. *See RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444, 221 USPQ 385, 387 (Fed. Cir.1984); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360, 220 USPQ 763, 770 (Fed.Cir.1984). Although this burden of proof remains on the party alleging invalidity throughout the trial, once a prima facie case of acquiescence is established, the patentee must come forward with countervailing evidence.[12] *See TP Laboratories, Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534, 218 USPQ 871, 875–76 (Fed.Cir.1983).

On February 25, 1974, the PTO finally rejected the claims of Nemeth's grandparent application under 35 U.S.C. §§ 103 and 112 (first and second paragraphs). The rejection under section 112 (first paragraph) was based on the specification's lack of an enabling disclosure and failure to set forth a best mode, because the specification only described the encapsulating material as a "polyamide" without setting forth a specific polyamide or a method of preparation. Following this rejection, Armak filed the parent application and abandoned the grandparent application. The parent application described the claimed invention in substantially more detail than did the grandparent application by setting forth, *inter alia,* the best mode (*i.e.,* the encapsulating material used in Pennwalt's insecticide sold under the mark PENNCAP M), methods of producing encapsulated insecticides with specific examples, and a number of specific encapsulating materials (by disclosing the specific reactant monomers). Based on this evidence and the fact that Armak ultimately permitted a continuation of the parent application to issue as the Nemeth patent, we are satisfied that a prima facie case of acquiescence was established and that Armak had the burden of coming forward with countervailing evidence.

After reviewing the record, it is apparent that Armak presented no evidence rebutting the prima facie case of acquiescence in the PTO's enablement and best mode rejections. In fact, the testimony of Armak's witnesses shows only that Armak did acquiesce. At trial, Harold C. Nemeth, the inventor of the Nemeth invention, gave the following testimony:

Mr. Seidel [Pennwalt's counsel]:

Weren't you advised that ... the grandparent application ... had to be dropped because of insufficient data and insufficient number of examples? Yes or no, sir?

Mr. Nemeth:

Yes, I was advised of that.

Mr. Seidel:

Thank you. And that was your understanding of why the new application was filed on April 1, 1974, is that correct?

Mr. Nemeth:

The new application—yes.

Mr. Seidel:

Being the ... [parent] patent application, the file wrapper of which is PX–41 sitting in front of you there, sir.

Mr. Nemeth:

This was filed on April 1, '74.

Mr. Seidel:

And wasn't the reason that was filed was because more information about the microcapsule wall was needed?

Mr. Nemeth:

That's correct.

In addition, Mr. Nemeth's supervisor, Sydney H. Shapiro, testified as follows:

Mr. Seidel:

---

**12.** Although in *Litton v. Whirlpool,* 728 F.2d at 1439, 221 USPQ at 106–07, Litton was estopped from showing that its CIP application was only filed as part of an oral compromise made during an interview with the PTO's examiner, estoppel occurred, because a patent applicant must make the substance of such interviews of record. Having failed to do so, Litton was estopped from attempting to contradict the record with evidence that it did not acquiesce. Evidence unrelated to proceedings before the PTO can, however, be presented by a patentee to rebut a prima facie case of acquiescence. For example, a patentee can show he filed a CIP application to disclose improvements developed after the filing date of the parent application rather than to obviate a PTO rejection. Chisum, *Patents* § 13.03[3] (1984).

Isn't it a fact that it was your belief ... that the filing date of the ... [grandparent] application had been lost and that you would need actual examples of what the Penncap M microcapsule wall was to get a satisfactory patent application that would comply with Section 112 of the patent statute?

Mr. Shapiro:

Yes.

■ In view of Armak's failure to show that it did not acquiesce, Armak is estopped from asserting that the grandparent application complied with the first paragraph of 35 U.S.C. § 112 in order to gain benefit of that application's March 1, 1972, filing date under 35 U.S.C. § 120.[13] Accordingly, the Nemeth patent is only entitled to the April 1, 1974, filing date of the parent application.

■ By presenting evidence that the claimed invention of the Nemeth patent was sold to Helena and Borden over one year before the Nemeth patent's April 1, 1974, effective filing date, Pennwalt has made a prima facie case that the Nemeth invention was "on sale" under 35 U.S.C. § 102(b), and Armak had the burden of coming forward with contrary evidence.[14] *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 839, 221 USPQ 561, 567–68 (Fed.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1150, 219 USPQ 13, 17 (Fed. Cir.1983).

■ Armak's attempt to meet its burden of presenting rebuttal evidence by showing that the sales and uses were experimental, in accordance with the EPA temporary permit, was properly rejected by the district court. The fact that a sale or use occurs under a regulatory testing procedure, such as a FIFRA[15] experimental use permit, does not make such uses or sales per se experimental for purposes of 35 U.S.C. § 102(b). *Cf. Dunlop Co. v. Kelsey-Hayes Co.,* 484 F.2d 407, 413, 179 USPQ 129, 133 (6th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471, 181 USPQ 1 (1974); *Skil Corp. v. Rockwell Manufacturing Co.,* 358 F.Supp. 1257, 1261, 178 USPQ 562, 565 (N.D.Ill.1973), *aff'd in part, rev'd in part on other grounds sub nom. Skil Corp. v. Lucerne Products, Inc.,* 503 F.2d 745, 183 USPQ 396 (7th Cir.1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654, 185 USPQ 65 (1975). As the district court stated:

[T]he EPA was given the authority [under FIFRA] to issue temporary permits ... or "experimental use permits" ... to an applicant to gather information necessary to convince the EPA to register the pesticide for general use. Thus, this pesticide regulatory legislation prohibited the sale or shipment of all unregistered pesticides, whether patented or unpatented, unless they were transferred under a temporary EPA permit. The focus of these laws and regulations was to protect the environment ....

570 F.Supp. at 1106, —— USPQ at ——. On the other hand, a use or sale is experimental for purposes of section 102(b) if it represents a bona fide effort to perfect the invention or to ascertain whether it will answer its intended purpose. *Elizabeth v. Pavement Co.,* 97 U.S. 126, 137, 7 Otto 126, 137, 24 L.Ed. 1000 (1877). In view of the widely divergent purposes of experimentation under FIFRA and section 102(b), the

---

**13.** Our holding on the *threshold* question of whether Armak acquiesced in the PTO's rejections and, therefore, could not gain the benefit of the grandparent application's filing date makes it unnecessary to decide whether the district court correctly reached the same result based on its conclusions regarding the *secondary* questions of whether the claims of the Nemeth patent were supported by the disclosure of the grandparent application or whether the grandparent application *actually* met the enablement and best mode requirements of section 112 (first paragraph).

**14.** Although Pennwalt, rather than Armak, made the subject sales, it is well settled that the "on sale" bar applies to sales made by the inventor or another, with or without the inventor's consent. *Andrews v. Hovey,* 124 U.S. 694, 719, 8 S.Ct. 676, 686, 31 L.Ed. 557 (1888); *Hobbs v. United States, Atomic Energy Commission,* 451 F.2d 849, 859–60, 171 USPQ 713, 720 (5th Cir. 1971). It should be noted that the district court found that Armak did not place any restrictions on Pennwalt's use of RD–4237.

**15.** *See* note 5 *supra.*

validity of the Nemeth patent must be decided on objective evidence indicating the purpose of any testing in conjunction with Pennwalt's sales. *In re Smith*, 714 F.2d 1127, 1135, 218 USPQ 976, 983 (Fed.Cir. 1983).

Any experimentation over one year before an application's filing date must be for a bona fide experimental purpose rather than for commercial exploitation. *In re Dybel*, 524 F.2d 1393, 1400, 187 USPQ 593, 598 (CCPA 1975). If any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention. *In re Smith*, 714 F.2d at 1135, 218 USPQ at 983; *In re Theis*, 610 F.2d 786, 793, 204 USPQ 188, 194 (CCPA 1979). Here, based on testimony by Pennwalt's employees, the district court found that Pennwalt's primary motive in seeking an EPA temporary permit was for the commercial purpose of recovering developmental expenses and testing the market. It also found that manufacturing data collected under the temporary permit were used by Pennwalt to set a sales price and a gross margin goal for sales of its suspension.

Armak argues that Pennwalt's sales were made to test whether a suspension with xanthan gum would work following the failure of another suspending agent, distributed as SPONTO 176, and that Pennwalt's stated aim in seeking a temporary permit was to "collect additional residue, performance and other data to confirm information submitted herewith under various climatic ... conditions," which is a bona fide experimental purpose. The district court found that Pennwalt's activity under the temporary permit was not needed to demonstrate the suspension's utility or lack of need for further refinement,

because the usefulness of the suspension was demonstrated when it passed the cricket bioassay test. Also, the effectiveness of xanthan gum as a suspension agent was demonstrated by both Armak and Pennwalt prior to the sales of suspension by Pennwalt. Although prior suspensions utilizing the agent distributed as SPONTO 176 were unsatisfactory due to the leaching of methyl parathion out of the capsules, the record indicates that leaching was visually apparent from the suspension,[16] and, therefore, field tests were not needed to determine whether this problem existed. As to Pennwalt's stated purpose for seeking an EPA temporary permit, no matter what other purposes Pennwalt may have had, by Armak's own admission in its reply brief, Pennwalt's "real goal" in conducting experimental testing under the temporary permit was to obtain a *commercial* label so that large quantities of suspension could be manufactured and sold. Such a dominant commercial motive can hardly be deemed incidental. *Id.*

Accordingly, the district court correctly held as a matter of law that the Nemeth invention was "on sale" under section 102(b),[17] and the Nemeth patent was, therefore, properly held invalid.

## 2. *State Law Counterclaims*

Armak argues that regardless of whether the Nemeth patent is valid, Pennwalt is liable for its use of the Nemeth invention under the PDA, under an implied contract, or for unjust enrichment. However, we are persuaded that the district court's reasons for holding that the PDA is not applicable to Armak's development of

---

**16.** At trial Pennwalt's witness Chester B. DeSavigny testified as follows:

Mr. Seidel:
   Was there any visual evidence of the methyl parathion coming out of the capsule?
Mr. DeSavigny:
   If you are talking about looking into a container as a farmer would, all he would see is that it didn't look like the last batch he used, because all he could see was a brownish liquid on there. If you would have been looking

at this in a glass container, you would see three distinct layers, the bottom one being capsule wall material; the next one being methyl parathion; and the top one being water....

**17.** In view of our conclusion that the Nemeth invention was "on sale," we do not reach the question of whether the district court correctly concluded that the invention was in "public use" under section 102(b).

the Nemeth invention and that Armak was not entitled to recover under an implied contract or in equity were correct.

3. *Attorney Fees*

The district court's refusal to award attorney fees under 35 U.S.C. § 285 is reviewed under the abuse of discretion standard and will be overturned if its finding of no exceptional circumstances is clearly erroneous. *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529 at 1540 (Fed. Cir.1984), and cases cited therein. Here, Pennwalt contends that during prosecution of the applications corresponding to the Nemeth patent, Armak committed acts of fraud and inequitable conduct which make this case "exceptional." However, we are satisfied that the district court's finding of no exceptional circumstances was not clearly erroneous and that its denial of Pennwalt's request for an award of attorney fees was, therefore, not an abuse of discretion.

In view of the foregoing, the decision of the district court is affirmed.

AFFIRMED.