**In re Morris EPSTEIN.**

No. 93–1283.

United States Court of Appeals,
Federal Circuit.

Aug. 17, 1994.

Gregor N. Neff, Curtis, Morris & Safford, P.C., New York City, argued for appellant. With him on the brief was Adam L. Brookman.

Lee E. Barrett, Associate Sol., Office of the Sol., Arlington, VA, argued for appellee. With him on the brief was Fred E. McKelvey, Sol.

Before PLAGER, Circuit Judge, COWEN, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

This appeal is from the January 22, 1993 decision of the United States Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (Board), Appeal No. 92–2705. In its decision, the Board affirmed the examiner's rejection of all pending claims (1–13, 15, 17, and 20–59) in appellant Epstein's patent application serial No. 07/326,749, filed March 21, 1989, for an "Integrated Electronic Parts Warehousing and Distribution System and Method." Claim 44 stands rejected as anticipated under 35 U.S.C. § 102(b) (1988) by a software product

entitled "CONTROL SYSTEM" which, as evidenced by a catalog listing, was "in public use or on sale" more than one year before appellant's filing date. All claims stand rejected as obvious under 35 U.S.C. § 103 (1988) by the CONTROL SYSTEM software product, either alone or in combination with various references. We affirm.

## BACKGROUND

Appellant's patent application is directed generally toward a computerized multi-vendor central parts warehouse. The concept is that parts of any type (e.g., fasteners, electronic parts, office supplies, and the like), or at least information on the parts, from a number of vendors are stored in a single warehouse system. The system enables a buyer to do one-stop parts shopping via computer link to the system. The system has computerized features for handling various aspects of the buying, selling, and storage and retrieval of parts in or from the warehouse system.[1] In the preferred embodiment, both buyers and vendors can communicate electronically with a central computer from remote terminals. Vendors can list parts available from them, and buyers can determine which vendors offer parts they seek and place their orders electronically.

Appellant filed the application on March 21, 1989. In a first office action dated March 20, 1991, the examiner allowed all but three of the fifty-eight then-pending claims over the following prior art:

1) U.S. Patent No. 4,734,858 to Schlafly for "Data Terminal and System for

Placing Orders," which was filed November 26, 1984, and issued March 29, 1988;

2) Canada Patent No. 1,188,814 to Epstein for "Warehousing System and Method," which issued on June 11, 1985; and

3) "EMPTOR" database product brochure, dated 1983.

Applicant responded on April 10, 1991, by cancelling two of the disallowed claims and amending the other disallowed claim as suggested by the examiner.

In a subsequent office action dated May 23, 1991, a new examiner, relying on several newly discovered publications, withdrew the previous allowance and rejected all pending claims. As listed by the examiner, the newly discovered publications were:

1) "CONTROL SYSTEM 7.0" software product, as described in a database print-out (no date), which states a release date of January 1982;

2) "SMART/SCSS" software product, as described in a Datapro Research Group catalog dated February 1991, which states a first installation date of January 1987;

3) "Pro–Search" software product, as described in a database print-out (no date), which states a release date of October 1986, for version 1.08, and October 1, 1987, for version 1.07;

4) "DIALOG" database system, as described in a seminar book dated June 1988, which contains DIALOG file descriptions separately dated March 1987

---

1. Application claim 1 is illustrative; it reads:
    1. A method for electrically ordering selected physical items, said method comprising the steps of:
    a) providing a computer with data storage and retrieval equipment at a first station;
    b) providing a buyer input/output ("I/O") device with a display screen at each of a plurality of buyer stations, each of which is remote from said first station and at least one other of said buyer stations;
    c) providing means for electrically transmitting and receiving signals between each of said I/O devices and said computer;

d) storing in a single warehouse system the goods of a plurality of vendors;
e) storing in said computer the identities of said vendors and the items stored by said vendors in said warehouse system;
f) displaying on said screen of one of said buyer I/O devices a list of vendors who store a pre-determined item in said warehouse system; and
g) placing an order for said item from a selected one of the vendors listed by transmitting a signal to said computer.
[JA 250.]

and sample DIALOG searches (not separately dated);

5) "CONTROL SYSTEM" software product, as described in a Datapro Research Group catalog dated February 1991, which states a first installation date of March 1982; and

6) "DCS2000" software product, as described in a Datapro Research Group catalog dated February 1991, which states a first installation date of 1977.

Only one of these publications—the DIALOG seminar book—is a prior art publication. The other publications are not prior art themselves; rather, they allegedly evidence prior art products. The examiner rejected one claim (claim 44) as being anticipated under 35 U.S.C. § 102(b) by the CONTROL SYSTEM software product. In addition, the examiner rejected all then-pending claims (1–13, 15, 17 and 20–59) as being obvious under 35 U.S.C. § 103 over one or more of the newly discovered prior art items (including, at least, the CONTROL SYSTEM software product) in combination with one or more of the prior art items cited by the previous examiner.

As indicated above, the Board affirmed the examiner's rejections as to all the claims. In so doing, the Board rejected appellant's argument that, because several of the newly discovered prior art software products were described in writings dated after the applicant's filing date, such software products were not properly considered prior art and were not competent evidence of the level of skill in the art at the time of the invention. Board op. at 5–7. The Board also rejected appellant's argument that various publications cited by the examiner were not enabling of the features for which they were cited. *Id.* at 5. Finally, because appellant's brief did not address the merits of the prior art rejections, the Board sustained the rejections. *Id.* at 7.[2]

Appellant seeks from this Court reversal of the Board's decision and an Order that the Commissioner issue a Notice of Allowance.

## DISCUSSION

### I. ISSUES

The issue of greatest import in this case is whether there is clear error in the Board's fact finding in support of its legal conclusion that various third-party software products were "in public use or on sale" more than one year before appellant's filing date, and thus were properly considered prior art. These software products are described in various abstracts that, as the PTO admits, are not prior art publications; however, the abstracts do indicate that the products were "first installed" or "released" prior to one year before appellant's filing date. Appellant argues that, with only the abstracts as evidence, the PTO has not met its evidentiary burden of proving the "in public use or on sale" status of the third-party software products by a preponderance of the evidence. Closely related to this issue is whether there is clear error, as appellant argues there is, in the Board's fact finding that the abstracts evidence the level of ordinary skill in the art at the time the invention was made.

Also at issue in this case is whether the Board erred as a matter of law in concluding that the publications used by the examiner are sufficiently enabling of the features for which they are cited. Appellant claims that the Board erred on this point. Finally, there is the issue of whether the Board clearly erred, as appellant claims it did, in sustaining the examiner's rejection of the claims at issue as either obvious or anticipated.

### II. SUBSEQUENTLY PUBLISHED ABSTRACTS AS EVIDENCE OF "IN PUBLIC USE OR ON SALE" PRIOR ART AND LEVEL OF SKILL IN THE ART

The cited prior art software products—CONTROL SYSTEM, CONTROL

---

**2.** In addition, the Board stated that its jurisdiction did not allow it to address appellant's concerns over the examiner's rejection of previously allowed claims; nevertheless, the Board noted that the deference given to a previous examiner's work product is far outweighed by the duty of a subsequent examiner to issue valid patents. Board op. at 4–5.

SYSTEM 7.0, DCS2000, SMART/SCSS, and Pro–Search—are described in abstracts. CONTROL SYSTEM 7.0 and Pro–Search are described in undated abstracts which the examiner retrieved from a computer database. CONTROL SYSTEM, DCS2000, and SMART/SCSS are described in abstracts contained in a Datapro Research Group catalog dated February 1991. The PTO concedes that the abstracts themselves are not prior art under the "printed publication" provision of section 102(b). Each of the abstracts, however, asserts a "release" or "first installation" date for its respective software product of more than one year before appellant filed his patent application. The PTO therefore contends that the abstracts evidence the following: (1) that the software products described in the abstracts were "in public use or on sale" within the meaning of section 102(b) and thus properly considered prior art,[3] and (2) the level of skill in the art at the time the invention was made.[4]

Before the examiner and the Board, appellant steadfastly maintained that the PTO could not meet its evidentiary burden with only the abstracts as evidence. In support of its position, appellant made arguments as to why the abstracts were insufficient, and also speculated as to reasons why the information in the abstracts might not be accurate or reliable. Appellant, however, proffered no evidence in support of his contentions. Consequently, the Board held: "In the absence of evidence that the dates printed in the abstracts are not true dates of public use of the systems described therein, we will accept the abstracts as evidence of prior art and of the level of ordinary skill in the art." Board op. at 5–6.

Section 102(b), title 35, provides in pertinent part: "A person shall be entitled to a patent unless ... the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...."[5] Whether something is "in public use or on sale" within the meaning of section 102(b), and thus properly considered prior art, is a question of law with subsidiary issues of fact. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed.Cir.1990). The section 102(b) "public use" and "on sale" bars are not limited to sales or uses by the inventor or one under the inventor's control, but may result from activities of a third party which anticipate the invention, or render it obvious. *Andrews v. Hovey*, 124 U.S. 694, 719, 8 S.Ct. 676, 686, 31 L.Ed. 557 (1888); *J.A. La Porte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1581, 229 USPQ 435, 437 (Fed.Cir.), *cert. denied*, 479 U.S. 884, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985); *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1580 n. 14, 222 USPQ 833, 837 n. 14 (Fed.Cir.1984); *General Elec. Co. v. United States*, 654 F.2d 55, 61–62, 228 Ct.Cl. 192, 211 USPQ 867, 873 (1981).

"[P]reponderance of the evidence is the standard that must be met by the PTO in making rejections...." *In re Caveney*, 761 F.2d at 674, 226 USPQ at 3. We review Board fact findings under the clearly erroneous standard. *Id.* "Under this standard of review, [Board] findings are overturned only if the court is left with the definite and firm

---

**3.** On appeal, the PTO for the first time contends that, in the alternative, the software products described in the abstracts are prior art under the "known or used by others in this country" provision of section 102(a) and the "invention in this country by another who had not abandoned, suppressed or concealed it" provision of section 102(g). We do not consider such alternative grounds, however, as they were not asserted before the Board. *See In re Margolis*, 785 F.2d 1029, 1032, 228 USPQ 940, 942 (Fed.Cir.1986).

**4.** The level of skill in the art is one of the underlying factual findings in support of an obviousness rejection. *Graham v. John Deere Co.*, 383

U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966). The level of skill in the art is measured as of the time the invention was made. *Id.* In this case, because there is no suggestion that an earlier time should be the focus of the inquiry, the time relevant to the level of skill inquiry is when the application was filed, March 21, 1989.

**5.** One year before the filing of the application is referred to as the "critical date" for purposes of measuring the "in public use or on sale" status.

conviction that a mistake has been made." *Id.* (citing *SSIH Equip. S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 381, 218 USPQ 678, 692 (Fed.Cir.1983) (Nies, J., additional views)).

We have reviewed the abstracts and note the following about them. Each abstract contains a description of its particular software product, including the various features relied upon by the examiner in rejecting appellant's claims. Each abstract identifies the software vendor by name and provides the vendor's address and phone number. Each abstract provides information useful to potential buyers, including who to contact, price terms, documentation, warranties, training and maintenance. Each abstract states the date that the product was first released or installed, which dates range from 1977 to January 1987. Finally, all the abstracts, excepting only the abstract of Pro–Search 1.08, disclose the number of current users; these range in number from ten to fifty-eight.

■ Appellant's primary argument on appeal is that, because the "release" and "first installed" dates listed in the abstracts are hearsay not within any exception to hearsay rules, the Board could not properly rely on the dates as proof that the software products noted were "in public use or on sale" at a time prior to the date the abstracts were published, or more particularly, a time prior to the critical date. For the same reason, appellant argues that such evidence also cannot establish the level of skill in the art at the time appellant's invention was made. Appellant attempts to illustrate the reliability problem by arguing that software suppliers have an incentive to exaggerate their claims to attract potential buyers.

We agree with appellant that the statements of "release" and "first installation" in the abstracts are, generally speaking, hearsay statements. The statements are out-of-court written assertions offered by the PTO to prove the truth of the matter asserted, namely, that the various software products were "in public use or on sale" at a time some two years before the date that the abstracts were published. *See* Fed.R.Evid. 801. We do not accept, however, the *per se* rule that hearsay statements can never be relied upon to establish facts necessary to support a rejection.

■ The general rule is that administrative agencies like the PTO are not bound by the rules of evidence that govern judicial proceedings. *See* 2 Am.Jur.2d *Administrative Law* § 345, at 350 (1994); Ernest H. Schopler, Annotation, *Comment Note.— Hearsay Evidence in Proceedings Before Federal Administrative Agencies,* 6 A.L.R.Fed. 76 (1971); *see also* Fed.R.Evid. 1101 (omitting administrative proceedings as coming within the applicability of the Federal Rules of Evidence). Agencies may provide for the application of evidence rules, as the PTO has so provided in patent interference proceedings, 37 C.F.R. § 1.671(b) (1993), and patent public use proceedings, *id.* § 1.292(a), both of which are *inter partes* in nature.[6] The PTO has not, however, provided for the application of evidence rules during *ex parte* examination.

■ The inapplicability of hearsay evidence rules in *ex parte* PTO examination is appropriate in light of the purpose and reason for the hearsay rule. As has been articulated by Professor Wigmore, "[t]he theory of the hearsay rule ... is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination." 5 John H. Wigmore, Evidence in Trials at Common Law § 1420, at 251 (James H. Chadbourn rev. 1974). During *ex parte* PTO examination, applicants are free to investigate hearsay assertions relied upon by an examiner during the three to six month period avail-

---

6. The PTO has also provided for the application of evidence rules in trademark *inter partes* proceedings. 37 C.F.R. § 2.122(a) (1993).

able to respond to an office action. They also have the right to introduce rebuttal evidence under 37 C.F.R. § 1.132 (1993). Moreover, if applicants wish to cross-examine the authors of written hearsay assertions, under 35 U.S.C. § 145 (1988) they may bring a civil action in the United States District Court for the District of Columbia seeking adjudication that they are entitled to receive a patent. In such an action, testimony could be compelled by subpoena under Federal Civil Procedure Rule 45. *See Gould v. Quigg,* 822 F.2d 1074, 1076, 3 USPQ2d 1302, 1303 (Fed.Cir.1987) ("While the evidentiary record before the Board serves as the 'evidentiary nucleus' of the district court proceeding in a section 145 action, the parties are entitled to submit additional evidence."). Accordingly, we reject appellant's argument that the PTO can never rely upon hearsay evidence in making rejections.

Moreover, as articulated by Professor Wigmore, the "test or security [of cross-examination] may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." 5 Wigmore, *supra,* § 1420, at 251. Here, we have no reason to believe that the abstracts and the statements of "release" and "first installed" appearing in the abstracts are inaccurate or that the authors of the statements are untrustworthy. There is nothing on the face of the documents that suggests the information has been altered in any way. Although it may be that the abstracts were prepared by the vendors of the various software products, we do not think that this necessarily makes them unreliable. Appellant, as we have indicated above, contends that marketers of such software products have an incentive to exaggerate the products' capabilities and that, therefore, assertions in the abstracts are unreliable. We acknowledge that such an incentive exists; however, we do not accept the proposition that because the incentive exists the assertions therefore must be inaccurate or unreliable. To flatly reject

the abstracts as unreliable would require us to assume that the vendors are engaging in false or misleading advertising, which—in the absence of evidence supporting such—we will not assume.

Thus, because the abstracts appear on their face to be accurate and reliable, and because appellant has failed to proffer any evidence to support his arguments to the contrary, we assume the truthfulness of the various assertions in the abstracts. However, even assuming the truthfulness of all the information in the abstracts, the Board's conclusions regarding "in public use or on sale" and evidence of skill in the art nevertheless require two additional facts to be inferred from the abstracts. First, it must be inferred that, as of a time before the critical date, the software products, and their various features cited by the PTO, were not initially released or installed under a veil of secrecy. In other words, it must be inferred that the products and their cited features either were in "public" use, or were on sale for a purpose other than a bona fide experimental one. Second, it must be inferred that the features of the software products that are relied upon by the PTO were in versions of the products as they existed at a time before the critical date.

■ Appellant attacks the sufficiency of the evidence supporting the existence of these two facts. First, regarding the inferred "public" nature of the products as of the critical date, appellant points out that the abstracts do not state that the "first installation" or "release" of the software was "public." Appellant further buttresses its argument by pointing out that if a software product had truly been released to the public without secrecy or confidentiality prior to the critical date, a publication bearing a sufficiently early publication date ought to be available. We do not find this argument persuasive. As is clear from their being publicly listed in abstracts having sales information, the products are commercial in nature. In the absence of any evidence, other than attorney argument, that the develop-

ment of the software products was initially to be kept secret or confidential, we can discern no clear error in a finding that the abstracts are preponderant evidence that the software products were also public commercial products at the time critical in this case. This conclusion is supported by the "first release" and "installed" dates, as well as by the current number of users of the systems, both of which appear in the abstracts.

■ Next, regarding the inferred existence of the features relied upon by the PTO as of the critical date, appellant points out that the abstracts do not show what it was that was actually first installed or released. Appellant also points out that the software products that were "first installed" or "released" may have been different from the products as described in the later-published abstracts. Again, in the absence of evidence to support this speculation, we do not find appellant's argument persuasive. To the contrary, we are persuaded by the relative importance of the various prior art features upon which the PTO relies when those features are considered in the context of the prior art products in which they appear. After reviewing the abstracts and the examiner's positions in this case, it appears to us that the features relied upon are not of the type that would be altered over the life of the product, either to upgrade the system or to eliminate existing bugs in the system. To the contrary, the relatively broad features relied upon by the examiner relate to the central purposes of the systems in which the features appear. For example, the examiner stated the following concerning the CONTROL SYSTEM reference:

> CONTROL System software is used for warehouse management and allows for direct order entry on a mainframe (equivalent to the claimed computer) by customers, via dial-up phone link from PCs or terminals at customer sites (equivalent to the claimed buyer stations). Inventory, price and order inquiries can also be performed at these remote sites. The ability to view a list of vendors who store a predetermined item in a warehouse is a well-

known feature available on many wholesale distribution warehouse management programs. Typically, this feature is accessed by keyword searching as taught by CONTROL System....

(Feb. 24, 1992 Examiner's Answer, at 3.) In the absence of any evidence, other than attorney argument, that earlier versions of the various prior art software products did not have certain features upon which the examiner has relied, we also can discern no clear error in a finding that the abstracts are preponderant evidence of the existence of the cited features as of the time critical in this case.

Accordingly, we find no clear error in the Board's fact finding with respect to the issues of public use/on sale and the level of skill in the art. Further, the facts—as set forth in, and inferred from, the abstracts—support the legal conclusion that the products, including the features upon which the PTO has relied to reject the claims, were "in public use or on sale" within the meaning of section 102(b) prior to the critical date.

### III. COMPETENCE AND ENABLEMENT OF THE REFERENCES

Appellant argues that the later-published abstracted descriptions of the software products CONTROL SYSTEM, CONTROL SYSTEM 7.0, DCS2000, SMART/SCSS, and Pro-Search, as well as the EMPTOR and DIALOG prior art printed publication references, all fail to make enabling disclosures of the features for which they have been cited. Additionally, with respect to the DIALOG reference, appellant contends that the reference completely fails to disclose the features for which it has been cited.

■ Turning first to the prior art software products described in the later-published abstracts, the parties' arguments focus upon whether the later-published abstracts make enabling disclosures. These arguments are misdirected. First off, it is the software products, not the abstracts, that are

the prior art. Further, we held earlier in this opinion that the Board did not clearly err in finding that the products, including the features upon which the examiner relied in rejecting the claims, were in public use or on sale. Beyond this "in public use or on sale" finding, there is no requirement for an enablement-type inquiry. *See J.A. LaPorte,* 787 F.2d at 1583, 229 USPQ at 439 ("[O]ur precedent holds that the question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that *embodies* the invention.").

■■■ With respect to the prior art printed publications, these references must be enabling, thus placing the allegedly disclosed matter in the possession of the public. *Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1479, 1 USPQ 2d 1241, 1245 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). As we have stated in the context of whether a specification sufficiently enables a claim under 35 U.S.C. § 112, para. 1 (1988), enablement is a question of law reviewed *de novo,* which may involve subsidiary questions of fact reviewed for clear error. *Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.,* 804 F.2d 659, 664, 231 USPQ 649, 652 (Fed.Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 764 (1987). The enablement issue in the context of whether a prior art reference is enabling of the features for which it has been cited is likewise a mixed question of law and fact. *See In re Sasse,* 629 F.2d 675, 681, 207 USPQ 107, 111 (CCPA 1980).

On the issue of enablement of the EMPTOR and DIALOG references (as well as the abstracts of the software products), the Board found as follows:

With respect to appellant's argument that the publications lack diagrams, flow charts, and source codes that would enable one of ordinary skill in the art to practice

the systems described in the publications, we find that the disclosure of appellant's system fails to provide the same detailed information concerning the claimed invention. In the absence of such a specific description, we assume that anyone desiring to carry out such computerized warehousing and inventory control systems would know of the equipment and techniques to be used. *See In re Fox,* 471 F.2d 1405, 176 USPQ 340 (CCPA 1973).

Board op. at 5.[7]

Appellant argues that this ruling is clearly erroneous because it contains the tacit admission that the references would not be enabling but for the fact that appellant's own specification also lacks an enabling disclosure. We disagree with this characterization of the Board's finding. Appellant's claims were not rejected under 35 U.S.C. § 112, para. 1, as lacking an enabling disclosure. Nor did the Board indicate that appellant's specification lacks such an enabling disclosure. Rather, the Board's observation that appellant did not provide the type of detail in his specification that he now argues is necessary in prior art references supports the Board's finding that one skilled in the art would have known how to implement the features of the references and would have concluded that the reference disclosures would have been enabling.

Aside from his misdirected assignment of error, appellant makes no attempt to address why the EMPTOR description would have been non-enabling of the features for which it has been cited—namely, an electronic ordering system for a plurality of vendors (which inherently would have a plurality of buyer stations) and the ability to view a list of vendors. Appellant, therefore, has not met his burden to rebut the board's conclusion of enablement. *See In re Sasse,* 629 F.2d at 681, 207 USPQ at 111 ("Whether those skilled in the art already possessed the necessary precursors is an issue subject to a shifting burden of proof.").

7. As discussed above, the abstracts of the software products are not the proper focus of the inquiry. Thus, our review of this finding of the Board applies with respect to the EMPTOR and DIALOG references only.

■ With respect to the DIALOG reference, appellant makes the additional argument that the reference is both incompetent and non-enabling because the reference completely fails to disclose the features for which it has been cited. The DIALOG reference was cited against claims 11, 12, 36 and 37, which are dependent claims and which recite the following features of the warehousing system: (i) keeping track of and (ii) displaying the number of times a particular vendor is displayed to a buyer. Although the Board did not specifically address the DIALOG reference, it accepted the following statement of the examiner regarding the reference:

Claims 11 and 12 are directed to an access frequency tracking scheme wherein the computer records every occurrence wherein a vendor's name is sent to a buyer's station. This type of database tracking is well-known in the art. For example, "DIALOG®" records not only how often a database (e.g. INSPEC) is accessed but how long it is accessed for. Additionally, each full-record retrieval of a database record (e.g. Format 5 retrieval in INSPEC) is recorded for subsequent customers billing and royalty payment purposes. An artisan would have found claim 11 to have been obvious in view of such well-known tracking systems as taught by "DIALOG®". As per claim 12, allowing a vendor to retrieve such data would have been an obvious design choice in view of the fact that the computer already stores the information.

. . . .

These claims [36 and 37] are rejected for the same reasons as given above with respect to claims 11 and 12.

(Examiner's Answer, at 6, 10 (Feb. 24, 1992).)

Of particular importance is the following sample DIALOG search record contained in the reference:

```
?Logoff
            19mar87  17:28:02  User013187
$1.00       0.012 Hrs File47
$0.00       2 Types in Format 6
$0.00       2 Types
$6.00       30 Prints in Format 5
$6.00       1 Print transaction(s)
$0.09       Dialnet
$7.09       Estimated cost this file
$7.20       Estimated total session cost  0.015 Hrs.
 LOGOFF:  level 12.4.6  B  17:28:06
```

(Joint Appendix, at 114.) This search record indicates the search time (0.012 hours) in a certain database—file 47, which is "MAGAZINE INDEX 1959–MARCH 1970, 1973–87 MAR." Because each search is billed by database and time, the examiner found that "'DIALOG®' records not only how often a database . . . is accessed but how long it is accessed for." The search printout further indicates that "30 Prints in Format 5" were made at a cost of $6.00. The cost of a Format 5 print is $0.20; therefore, the examiner correctly stated that "each full-record retrieval of a database record . . . is recorded for subsequent customers billing and royalty payment purposes." Appellant has failed to point to an error of the examiner. Further, appellant has not presented any evidence to show that the examiner's general finding that "database tracking is well-known in the art" is clearly erroneous.

## IV. THE MERITS OF THE ANTICIPATION AND OBVIOUSNESS REJECTIONS

■ Appellant argues that even if the new references are effective as prior art and contain enabling disclosures, they do not disclose or suggest appellant's invention. Appellant, however, is precluded from arguing the substance of the anticipation and obviousness issues on appeal because he did not argue patentability in his brief to the Board as required under 37 C.F.R. § 1.192(c)(6)(iii) and (iv) (1993). See In re Wiseman, 596 F.2d 1019, 1022, 201 USPQ 658, 661 (CCPA 1979) (dismissing arguments not made first to the Board). We note that the Board stated: "Appellant's brief does not contain any arguments that directly address the prior art rejections of the claims on appeal under 35 U.S.C. 102(b) and 35 U.S.C. 103." Appellant does not challenge this statement. Nor does appellant challenge any of the substantive reasons for the rejections detailed in the May 23, 1991 office action or the Examiner's Answer to the Board.

## CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed.

AFFIRMED.

PLAGER, Circuit Judge, with whom COWEN, Senior Circuit Judge, joins, concurring.

■ I join the opinion of the majority. I write because there is an anomaly here. Logic would dictate that when an applicant seeks a grant of property[1] from the government the applicant bears the burden of establishing entitlement to that grant. That, however, is not the rule in patent law; the rule is that the burden of persuasion is on the PTO to show why the applicant is not entitled to a patent. *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed.Cir.1992) (Plager, J., concurring); *In re Warner*, 379 F.2d 1011, 1016, 154 USPQ 173, 177 (CCPA 1967), *cert. denied*, 389 U.S. 1057, 88 S.Ct. 811, 19 L.Ed.2d 857 (1968); *see also In re Caveney*, 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir. 1985) ("[P]reponderance of the evidence is the standard that must be met by the PTO in making rejections.").

Perhaps the explanation lies in the way that the statute is written: "A person shall be entitled to a patent unless—". 35 U.S.C. § 102 (1988). Whether a different rule would prevail if the statute said, "To be entitled to a patent, an applicant shall establish ..." is a question that purists can debate. Whatever the case, the rule is now well established.

■ In an attempt to relieve the PTO of the full impact of this rule, there are various other rules that require the applicant to tell what he knows and to deal in good faith with the PTO. *See, e.g.,* 37 C.F.R. § 1.56 (1993). But there are problems in enforcing these requirements, and their efficacy may be questioned. As a practical matter, the primary corrective for the anomaly is the practice referred to as the "prima facie case."

The name is a misnomer, although the practice and the classic meaning of prima facie have similarities. Under the PTO practice, the PTO may meet its burden of persuasion initially by showing reasons why the applicant is not entitled to a patent. This shifts the burden of production (of evidence) to the applicant to show why the PTO is wrong—to rebut the prima facie case. One function of the PTO's prima facie case practice is to force the PTO examiners to set forth specific objections, which can be met by the applicant, and not just to make a general rejection.[2]

As this case illustrates, another function is to relieve the PTO of the responsibility to know all there is to know about everything. It is not unreasonable to expect the applicant to know more about the prior work in the relevant art than the PTO examiner. Is it unreasonable to require the applicant to do the necessary legwork to assure the PTO that legitimate questions about that prior work are answered? The alternative—argued here by the applicant—is to require the PTO examiners to do any investigation suggested by available information. Since more and more information is now available on computer databases, that could require a staff of investigators far in excess of the resources currently available to the PTO. At bottom, the issue in this case is who is to bear the cost of further investigation when further investigation is thought warranted.

The solution agreed to by the panel, and with which I concur, is at least for now to allow the PTO to use its immediately available data sources to identify legitimate questions that need answering, and then to place upon the applicant the burden of finding those answers.[3] In legalese this means that the PTO has met its burden of production,

---

1. 35 U.S.C. § 261 (1988) ("Subject to the provisions of this title, patents shall have the attributes of real property."); *see also* Charles Reich, *The New Property*, 73 Yale L.J. 733 (1964).

2. I here use "objections" and "rejection" in their common meaning, not as the technical terms defined in the *Manual of Patent Examining Procedures* § 706.01 (1994).

3. As the majority points out, applicant's arguments concerning the reliability of the computer abstracts—specifically, that the installation dates for the computer programs were inaccurate, the computer programs, as installed, differ from those described in the abstracts, the computer programs may have been subject to a veil of secrecy when installed—were unsubstantiated. Accordingly, applicant failed to sufficiently satisfy this burden.

and now the burden of production or going forward shifts to the applicant. The ease with which the PTO can do this in some measure may undercut the rule placing the initial burden on the PTO, and that may be as it should. The practice could also be subject to abuse, and become a way to stall or harass applicants. That is something against which the PTO and this court will have to guard. This case perhaps illustrates both the paradigmatic case and the limits of that practice.