This Opinion is a
Precedent of the TTAB

Mailed: May 26, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Joel Embiid*

————

Serial No. 88202890

————

April L. Besl and Ashley J. Earle of Dinsmore & Shohl LLP for Joel Embiid.

Lindsey H. Ben, Trademark Examining Attorney, Law Office 108,
   Kathryn E. Coward, Managing Attorney.

————

Before Adlin, Larkin, and English,
   Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Joel Embiid ("Applicant") seeks registration on the Principal Register of the standard character mark TRUST THE PROCESS for "shoes," in International Class 25.[1]

The Trademark Examining Attorney has refused registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that it

---

[1] Application Serial No. 88202890 was filed on November 21, 2018 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce.

so resembles the standard character mark TRUST THE PROCESS registered on the Principal Register for "Clothing, namely, shirts and sweat shirts," in International Class 25,[2] and owned by Marcus Lemonis LLC ("Registrant"), as to be likely, when used in connection with the goods identified in the application, to cause confusion, to cause mistake, or to deceive.

When the Examining Attorney made the refusal final, Applicant appealed and requested reconsideration, which was denied. The appeal is fully briefed.[3] We affirm the refusal to register.

## I.  **Record on Appeal**[4]

The record on appeal includes the following:[5]

- USPTO electronic records of the cited registration, made of record by the Examining Attorney;[6]

---

[2] The cited Registration No. 4942425 issued on April 19, 2016. It also covers services in International Class 35 that are not relied on by the Examining Attorney in support of the refusal to register.

[3] Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear. Applicant's appeal brief appears at 6 TTABVUE and his reply brief appears at 10 TTABVUE. The Examining Attorney's brief appears at 8 TTABVUE.

[4] Citations in this opinion to the application record, including the request for reconsideration and its denial, are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

[5] Applicant submitted duplicate versions of some evidence, which complicated our review of the record.

[6] December 21, 2018 Office Action at TSDR 2-3.

- USPTO electronic records of third-party, use-based registrations of marks for both shoes, and shirts or sweatshirts, made of record by the Examining Attorney;[7]

- USPTO electronic file histories of third-party registrations of, and applications to register, PROCESS-formative marks for various items of clothing, made of record by Applicant;[8]

- USPTO electronic file histories of Applicant's Registration No. 5753180 of the standard character mark THE PROCESS for "Apparel, namely, shirts, sweatshirts, shorts, sweatpants, hats, flip flops," and Applicant's Application Serial No. 88108956 to register the standard character mark THE PROCESS for "Backpacks" and "Athletic footwear, socks, casual footwear, sweatsuits, hoodies," made of record by Applicant;[9]

- USPTO electronic records of registrations of "pairs" of the same mark or very similar marks, registered for shoes by one entity and for clothing by another entity, made of record by Applicant;[10]

- Internet webpages showing the sale of shoes, and shirts or sweatshirts, under the same mark, made of record by the Examining Attorney;[11]

---

[7] *Id.* at TSDR 11-29; January 31, 2020 Final Office Action at TSDR 2-20, 24-38, 174-93.

[8] June 21, 2019 Response to Office Action at TSDR 80-248, 352-442.

[9] *Id.* at TSDR 249-351; July 31, 2020 Request for Reconsideration at TSDR 83-88.

[10] July 31, 2020 Request for Reconsideration at TSDR 48-82.

[11] January 31, 2020 Final Office Action at TSDR 39-170.

- Internet webpages and articles discussing Applicant, a professional basketball player with the Philadelphia 76ers of the National Basketball Association ("NBA"), his life story, and his career, made of record by Applicant,[12] and the Examining Attorney;[13]

- Internet webpages and articles discussing the rebuilding of the Philadelphia 76ers NBA franchise during the early and mid-2010s, and the origin and development of the phrase "Trust the Process," made of record by Applicant;[14]

- Internet webpages regarding Marcus Lemonis, whose eponymous LLC owns the cited registration,[15] which show him to be the host of a television show for entrepreneurs and businesspeople entitled "The Profit" on CNBC, and which show goods sold under the mark in the cited registration, made of record by Applicant;[16]

- Internet webpages showing the sale of shoes, and clothing or shirts, as separate listed categories of goods, made of record by Applicant;[17] and

---

[12] June 21, 2019 Response to Office Action at TSDR 13-28, 34-36; July 31, 2020 Request for Reconsideration at TSDR 105-07, 117-33, 139-44.

[13] July 15, 2019 Office Action at TSDR 2-17.

[14] June 21, 2019 Response to Office Action at TSDR 29-33, 42-65; July 31, 2020 Request for Reconsideration at TSDR 89-104, 134-38, 148-62.

[15] Both Applicant and the Examining Attorney mistakenly attribute ownership of the cited registration to Mr. Lemonis himself, and refer to him in their briefs as the "Registrant" or "registrant."

[16] June 21, 2019 Response to Office Action at TSDR 37-41; July 31, 2020 Request for Reconsideration at TSDR 110-16, 145-47.

[17] June 21, 2019 Response to Office Action at TSDR 66-79; July 31, 2020 Request for Reconsideration at TSDR 34-47.

- An online capture of Applicant's Instagram page, made of record by Applicant.[18]

## II. Background

Applicant claims that his mark TRUST THE PROCESS is uniquely associated with him when used in connection with shoes, the goods for which he seeks registration, and that the cited mark TRUST THE PROCESS is uniquely associated with Marcus Lemonis when used in connection with shirts and sweat shirts, the goods for which it is registered. We must therefore consider the phrase "Trust the Process," and the ways in which it has taken on a life of its own, before considering the legal issues raised by the refusal. We provide below some general background regarding the phrase.[19]

---

[18] July 31, 2020 Request for Reconsideration at TSDR 108-09.

[19] Because we are more permissive regarding the use of hearsay in ex parte appeals, this background is derived from news articles made of record by both Applicant and the Examining Attorney, who also made of record a Wikipedia entry regarding Applicant and his basketball career. Although under Trademark Rule 2.122(a), 37 C.F.R. § 2.122(a), inter partes proceedings are governed by the Federal Rules of Evidence, including the rule against hearsay, Fed. R. Evid. 802, there is no corresponding evidence rule for ex parte proceedings. *See, e.g.*, *In re Epstein*, 32 F.3d 1559, 31 USPQ2d 1817, 1821 (Fed. Cir. 1994) (hearsay rule inapplicable in ex parte examination). The Board may still consider the hearsay nature of evidence in assessing its probative value in an ex parte proceeding, but has frequently noted that it "generally takes a somewhat more permissive stance with respect to the admissibility and probative value of evidence in an ex parte proceeding than it does in an inter partes proceeding . . . ." *In re Canine Caviar Pet Foods, Inc.*, 126 USPQ2d 1590, 1597 (TTAB 2018) (citing TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) Section 1208); *In re Hudson News Co.*, 39 USPQ2d 1915, 1920 n.10 (TTAB 1996), *aff'd without op.*, 114 F.3d 1207 (Fed. Cir. 1997) ("Although there is a hearsay element to this evidence, there is no bias in the evidence which was not prepared for purposes of this case."). We also note that the truth of these general historical accounts is not in dispute between Applicant and the Examining Attorney, and does not bear directly on the registrability decision. By contrast, when we discuss the articles per se below, we consider them only for what they say and show on their face, which is relevant to consumer perception of the phrases "The Process" and "Trust the Process."

The Philadelphia 76ers had been an unsuccessful NBA team for a number of years when it hired a new General Manager, Sam Hinkie, in 2013 to revitalize the franchise. At the outset of his tenure, Hinkie stated that he would focus on "process, not outcome" to rebuild the team, and he subsequently employed a controversial strategy of losing as many games as possible in order to secure high draft picks in the annual NBA player draft. Many 76ers fans and others came to view Hinkie's strategy as "the process," and some fans indicated in social media and elsewhere that they would "trust the process." Two examples are shown below:



[20]



A fan shows off his 'Trust the Process' T-shirt during the 2015 NBA draft. *Via YouTube*

[21]

---

[20] June 21, 2019 Response to Office Action at TSDR 50.

[21] *Id.* at TSDR 56.

Applicant was drafted by the 76ers out of the University of Kansas with the third overall pick in the 2014 NBA draft, but injuries prevented him from playing until the 2016-17 NBA season. While he was rehabilitating, he too encouraged 76ers fans to "Trust the Process":



Alas, the trust in Hinkie apparently faded, and he resigned in 2016 before Applicant made his NBA debut. As discussed and shown below, following Hinkie's departure, Applicant began to refer to himself as "The Process," and others did as well. He registered and applied to register THE PROCESS for various clothing items and footwear, and he also made certain uses of "Trust the Process" in social media and elsewhere.

Marcus Lemonis is the host of the CNBC program "The Profit," and is known for the mantra "People/Process/Product," as shown on the CNBC website for the program:

---

[22] *Id.* at TSDR 50.



Mr. Lemonis is also associated with the mantra on his website, which displays a t-shirt bearing the phrase "Trust the Process" in quotation marks together with shirts bearing other phrases, and which states that visitors can customize shirts "with your favorite #the profit quotes" and that "[s]hirts with Marcus Lemonis quotes (sayings) imprinted on the front will also include the P[3] symbol on the back collar":



---

[23] July 31, 2020 Request for Reconsideration at TSDR 146.

[24] *Id.* at TSDR 115.

The Facebook page for "The Profit" appears to use "trust the process" aspirationally:



It is against this backdrop that we must decide whether the relevant public is likely to be confused by the simultaneous use of the phrase TRUST THE PROCESS as trademarks by Messrs. Embiid and Lemonis (through his LLC).

## III.    Analysis of Refusal

Section 2(d) of the Trademark Act prohibits registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods or services of the applicant, to cause confusion, mistake, or deception. 15 U.S.C. § 1052(d). Our determination of the likelihood of confusion under Section 2(d) is based on an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). We consider each *DuPont* factor for

---

[25] *Id.* at TSDR 116.

which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

Two key *DuPont* factors in every Section 2(d) case are the first two factors regarding the similarity or dissimilarity of the marks and the goods or services, because the "fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). Applicant addresses these two key factors, 6 TTABVUE 8-15, as well as the third *DuPont* factor, the "similarity or dissimilarity of established, likely-to-continue trade channels," *DuPont*, 177 USPQ at 567, 6 TTABVUE 15-17; the fourth *DuPont* factor, the "conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing," *DuPont*, 177 USPQ at 567, 6 TTABVUE 17-20; the sixth *DuPont* factor, the "number and nature of similar marks in use on similar goods," *DuPont*, 177 USPQ at 567, 6 TTABVUE 20-21; the eighth *DuPont* factor, the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion," *DuPont*, 177 USPQ at 567, 6 TTABVUE 21-22; and the thirteenth *DuPont* factor, "[a]ny other established fact probative of the effect of use." *DuPont*, 177 USPQ at 567, 10 TTABVUE 3, 9-10.[26]

---

[26] Applicant uses the language of the ninth *DuPont* factor, the "variety of goods on which a mark is or is not used," *DuPont*, 177 USPQ at 567, the eleventh *DuPont* factor, the "extent to which applicant has a right to exclude others from use of its mark on its goods," *id.,* and the twelfth *DuPont* factor, the "extent of potential confusion, i.e., whether *de minimis* or substantial," *id.*, in the headings of sections of argument in his appeal brief, 6 TTABVUE 20-21, but does not discuss these factors in the body of his brief. Because there is no argument or record evidence directed to these factors, we have not considered them in our analysis of the likelihood of confusion.

### A.    Similarity or Dissimilarity of the Marks

Under the first *DuPont* factor, we consider "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps. v. Veuve Cliquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019).

The proper test regarding similarity "is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (internal quotation marks and citation omitted)). "The proper perspective on which the analysis must focus is on the recollection of the average customer, who retains a general rather than specific impression of marks." *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018) (citations omitted). Because the goods identified in the application are "shoes," and the goods identified in the cited registration are "shirts and sweat shirts," all without any restrictions or limitations as to their nature, price, or other features, the average customer here is an ordinary consumer.

Applicant's and Registrant's marks are both TRUST THE PROCESS. Applicant concedes that the marks are identical in sound and appearance, 6 TTABVUE 10, but vigorously disputes that they are identical, or even similar, in connotation and commercial impression because Applicant's mark identifies him, while Registrant's mark identifies Marcus Lemonis.

Applicant's overall position is that confusion is unlikely because the involved marks "are uniquely situated due to the well-known nature of Applicant and Registrant combined with the specific nature of the goods at issue." *Id.* at 11. He argues that the marks "have distinct commercial impressions" because Applicant "is a famous NBA basketball star, whose [sic] is known for his tagline 'TRUST THE PROCESS' and his nickname 'THE PROCESS,'" *id.* at 8, and his "TRUST THE PROCESS mark, synonymous with Mr. Embiid/Applicant, conveys a commercial impression and connotation of overcoming difficulties through perseverance and fortitude, based on Mr. Embiid himself." *Id.* at 9. Applicant points to the fact that the Examining Attorney required him to enter a consent to registration under Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c), because the Examining Attorney found that the words "THE PROCESS" within the mark identify Applicant.[27] According to Applicant, he

---

[27] July 15, 2019 Office Action at TSDR 1 ("'THE PROCESS' identifies the Applicant Joel Embiid. Please see the attached Internet evidence showing that this is his prevalent nickname, one that he gave himself. . . . To register a mark that consists of or comprises the name of a particular living individual, including a first name, pseudonym, stage name, or nickname, an applicant must provide a written consent personally signed by the named individual."). Applicant subsequently submitted a consent. January 8, 2020 Response to Office Action at TSDR 2.

> has embraced the TRUST THE PROCESS tagline and the public has come to associate TRUST THE PROCESS with Joel Embiid and his basketball prowess. As such, Applicant's Mark, when used on Applicant's shoes evokes the commercial impression of accessories that empower the wearer to endure hardship and transforming [sic] the wearer into a basketball star and a winner.

*Id.* at 9-10.

Applicant argues that "[i]n contrast, the Registrant's shirts and sweatshirts are promotional items in support of Marcus Lemonis's business advice and television show, **which has no connection to basketball or Mr. Embiid**." *Id.* at 9 (emphasis in original). According to Applicant,

> the cited registration is marketed in connection with the Registrant Marcus Lemonis' television show "The Profit," where he uses the phrase "trust the process" as one of his key pieces of advice for aspiring entrepreneurs and business people. . . . Lemonis is known for preaching his "Three P Mantra" of People/Process/Product to analyze business viability and opportunity. . . . As a result, and when considered with the "Providing business advice and information via a television show" services in the cited registration, the Registrant's clothing products engenders [sic] the commercial impression of a reminder to follow a formulaic multistep method for realizing business profit. Given the completely different meanings and commercial impressions engendered by the marks, confusion here is unlikely. The commercial impression and connotation of Registrant's mark, which evokes processes devoted to earning profits and trusting that you will make money is therefore unique and distinctly separate distinctive [sic] from that of Applicant's TRUST THE PROCESS mark. These drastic differences coupled with the contrasting celebrity personalities behind the marks ensure consumer confusion will not occur, despite the identical nature of the marks.

*Id.* at 10.

Applicant also argues that the marks differ in meaning because they "create sufficiently different commercial impressions **when applied to the respective parties' goods or services** such that there is no possibility for confusion despite overlaps in the marks." *Id.* (emphasis in original) (citing *In re Sears, Roebuck & Co.*, 2 USPQ2d 1312 (TTAB 1987); *In re British Bulldog, Ltd.*, 224 USPQ 854 (TTAB 1984); and *In re Sydel Lingerie Co.*, 197 USPQ 629 (TTAB 1977)).

The Examining Attorney responds that the "marks are identical in appearance, sound, and meaning" and "are likely to engender the same connotation and commercial impression when considered with applicant's and registrant's respective goods." 8 TTABVUE 5. She also argues that the fact that the marks are identical in appearance and sound outweighs "any difference in commercial connotation the marks may have," *id.*, and the fact that the public "has come to associate 'TRUST THE PROCESS' with Joel Embiid and his basketball career, contrasted with the registration being marketed in connection with a television show called 'The Profit,' has no bearing on whether the applied-for mark, on its face, would be confusingly similar to the identical registered mark." *Id.*[28]

The Examining Attorney distinguishes the cases cited by Applicant on the ground that "the marks in those cases were each separately and distinctly descriptive in

---

[28] Applicant claims that this argument, like the Examining Attorney's requirement of a consent under Section 2(c), is a concession by the Examining Attorney that Applicant is known by the phrase TRUST THE PROCESS. 6 TTABVUE 8-9; 10 TTABVUE 4. We need not concern ourselves with whether the Examining Attorney's actions and statements are concessions because "[i]n determining an ex parte appeal, the Board reviews the appealed decision of the examining attorney to determine if it was correctly made" and "need not find that the examining attorney's rationale was correct in order to affirm the refusal to register, but rather may rely on a different rationale." TBMP Section 1217 & n.1.

nature, or otherwise highly suggestive, with respect to the applied-for and registered goods, whereas the phrase 'TRUST THE PROCESS' has no real meaning with respect to the goods as applied-for and registered." *Id.* at 8. She also cites *In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017), in which the Federal Circuit affirmed the Board's decision that the applicant's standard character I AM mark for goods in Classes 3. 9, and 14 was likely to be confused with registered standard character and stylized I AM marks for the same or similar goods, and rejected the applicant's argument that a restriction limiting the goods to those "associated with William Adams, professionally known as 'will.i.am'" changed the meaning of the applicant's mark. *Id.* at 9. The Examining Attorney argues that this appeal "is analogous in that the Applicant is arguing that its [sic] goods are associated with Joel Embiid, and thus the mark is distinguishable due to his fame," but that "the well-known nature of the applicant does not change the meaning or overall commercial impression of the applied-for mark as it appears in the application, which is confusingly similar to the identical registered mark for 'TRUST THE PROCESS.'" *Id.*

In his reply brief, Applicant argues that the Examining Attorney "discounts the substantial evidence of fame of Applicant and Registrant and the impact of that individual fame on the connotation and commercial impression of the marks at issue," 10 TTABVUE 2, and that "the Examining Attorney provides no evidence or substantiation for the claim that the average purchaser would not take into consideration the established fame of Applicant and Registrant." *Id.*

Applicant's reliance on extrinsic evidence of the "fame of Applicant and Registrant and the impact of that individual fame on the connotation and commercial impression of the marks at issue," 10 TTABVUE 2, is misplaced. "We compare the applicant's and registrant's 'marks themselves.'" *i.am.symbolic*, 123 USPQ2d at 1748 (quoting *Denney v. Elizabeth Arden Sales Corp.*, 263 F.2d 347, 120 USPQ 480, 481 (CCPA 1959)). In this regard, we agree with the Examining Attorney that the Federal Circuit's decision in *i.am.symbolic* is analogous and instructive in our consideration of Applicant's evidence of fame outside the four corners of his application and the cited registration, which he offers to show that the identical TRUST THE PROCESS marks are not similar in meaning when used for shoes and clothing, respectively.

The applicant in *i.am.symbolic* owned registrations of I AM and WILL.I.AM for certain goods and services in Classes 9 and 41, and sought three additional registrations of I AM for goods in Classes 3, 9, and 14. The applications were refused registration under Section 2(d) based on registrations of the standard character mark I AM and two stylized "I am" marks for identical or similar goods. During prosecution of its applications, the applicant amended its goods identifications to include the phrase "all associated with William Adams, professionally known as 'will.i.am,'" who was the front man for The Black Eyed Peas musical group. *i.am.symbolic*, 123 USPQ2d at 1746. The Federal Circuit referred to this language as the "will.i.am restriction." *Id.*

The Federal Circuit held that the "identification of goods does not specify how Adams will be 'associated with' the goods," and the court "discern[ed] no error

with the Board's determination that the will.i.am restriction 'does not even represent that Mr. Adams will be named, or otherwise identified, in the promotion of the goods.'" *Id.* at 1748-49 (quoting *In re i.am.symbolic, llc*, 116 USPQ2d 1406, 1410 (TTAB 2015)). The court concluded that "there is nothing in the record that persuades us that the will.i.am restriction changes the meaning or overall commercial impression of the mark." *Id.* at 1749.

The court also agreed that "the Board's finding that Adams is not known by I AM or i.am is supported by substantial evidence" because "the websites and media coverage pointed to by [the applicant] consistently show that Adams is known as will.i.am, not I AM or i.am," *id.*, and that the applicant's "ownership of the class 25 registration [of I AM] and use of that mark in promoting and selling Adams's clothing line does not compel a finding that Adams is known by I AM or i.am," *id.*, noting that "Adams is identified as will.i.am, not I AM or i.am, in that context too." *Id.*

Here, there is nothing in Applicant's identification of "shoes" that would change the meaning of the mark as referring to Applicant in the context of the goods,[29] and nothing in Registrant's identification of "Clothing, namely, shirts and sweat shirts" that would change the meaning of the mark as referring to Marcus Lemonis, or the television program The Profit that he hosts, in the context of the goods as identified.[30]

---

[29] As discussed below under the second *DuPont* factor, we must construe the goods identified in the application to encompass all types of shoes, not just basketball shoes or shoes associated with Applicant, and must assume that they will be sold to all types of consumers, not just basketball fans or fans of Applicant. *See, e.g.*, *Sock It to Me, Inc. v. Fan*, 2020 USPQ2d 10611, at *8 (TTAB 2020).

[30] We must similarly construe the goods identified in the cited registration to encompass all types of clothing, not just promotional clothing for Registrant's television show, and must assume that they will be sold to all types of consumers, not just viewers of the show. As noted

Applicant's identification encompasses all types of shoes sold through any trade channel, and the identification of goods in the registration encompasses shirts and sweat shirts sold through any trade channel. There is nothing on the face of Applicant's mark, such as his image or signature, which ties the mark to him, and nothing in the record that in the context of shoes, TRUST THE PROCESS would necessarily mean Applicant.

In any event, the fact that Applicant may be known by one nickname does not establish that the public knows him by another, even if those nicknames contain common elements. There is no dispute that THE PROCESS identifies Applicant, but Applicant seeks to register a different nickname, TRUST THE PROCESS, and we find, based on the record as a whole, that Applicant failed to show that he is known to potential purchasers of shoes in the general public (or even to basketball fans) as "Trust the Process." Applicant identifies himself as "The Process" on his Instagram page;[31] a Wikipedia entry devoted to his life and basketball career identifies him as "The Process" and states that "[h]e has nicknamed himself 'The Process' in response

above, Applicant argues that "when considered with the 'Providing business advice and information via a television show' services in the cited registration, the Registrant's clothing products engenders [sic] the commercial impression of a reminder to follow a formulaic multistep method for realizing business profit." 6 TTABVUE 10. Applicant cites no authority, however, that for purposes of determining the connotation and commercial impression of Registrant's mark under the first *DuPont* factor, we must consider it in the context of services separately identified in the registration and not relied on by the Examining Attorney. The services in a separate class in the registration do not serve to limit the goods identified in Class 25.

[31] July 31, 2020 Request for Reconsideration at TSDR 109. The pages from Applicant's Instagram account in the record are undated, but Applicant is shown in one picture wearing a facial mask, suggesting that the snapshot was taken at some point in 2020 after the Covid-19 pandemic made the wearing of facial masks common in the United States.

to a refrain from 76ers fans during the Sam Hinkie era to 'trust the process,'"[32] and one article referred to in the preceding footnote states that he has been introduced as "Joel 'The Process' Embiid" in pre-game introductions.

Both Applicant and the Examining Attorney made media articles of record.[33] They mention the phrase "Trust the Process" in the course of discussing Applicant and his basketball career, but they primarily associate Applicant with the phrase "The Process."[34] For example, one article, entitled *Joel Embiid wants to be called 'The Process,' which is just about perfect*, quotes a reporter as saying that Applicant asked the 76ers public address announcer "to add his new self-claimed middle name 'The Process' to his official introduction."[35] The articles make some references to "Trust the Process," including Applicant's use of the hashtag in social media, but they primarily associate that phrase with Applicant's team and its recent history.[36] The

---

[32] *Id.* at TSDR 2. The statement is accompanied by footnotes with links to various articles entitled *A process toward success: Joel Embiid era begins (at last) in Philly* (nba.com, November 21, 2016) ("He is actually introduced in the starting lineup as 'Joel, The Process, Embiid'"); *If Joel Embiid is The Process, His Debut Proved We Should Trust Him* (*Complex*, October 27, 2016); *Joel Embiid: I'm the Process* (*Sports Illustrated*, October 26, 2016), *How Joel Embiid is Trolling the NBA* (*ESPN*, December 12, 2017), and *What Does Trust the Process Mean?* (SI.com, retrieved February 1, 2019).

[33] The articles are directed to NBA fans, in particular fans of the Philadelphia 76ers. Those fans are only a subset of the general public that we must deem to be the potential consumers of the involved goods for the reasons discussed below under the second *DuPont* factor. Applicant offers no evidence of the extent to which the articles were exposed to consumers other than basketball fans (or, for that matter, to basketball fans themselves). As a result, the articles have limited probative value regarding the perception of the terms "The Process" and "Trust the Process" by ordinary members of the general public.

[34] June 21, 2019 Response to Office Action at TSDR 14-28, 43-65; July 15, 2019 Response to Office Action at TSDR 9-17; July 31, 2020 Request for Reconsideration at TSDR 106-07.

[35] July 15, 2019 Response to Office Action at TSDR 10.

[36] June 21, 2019 Response to Office Action at TSDR 14-28 30-32, 43-65 (article entitled *The Definitive History of "Trust the Process,"* which begins "You would be hard-pressed to find a

articles help to show that Applicant is known to basketball fans primarily as "The Process," not as "Trust the Process," and with respect to members of the general public who do not follow basketball, they do not show association of either term with him.

With respect to Mr. Lemonis, the articles and webpages discussing his life and his television program "The Profit" on CNBC shown and described above in the Background section do not show that he (as the individual behind Registrant) is referred to as "Trust the Process." We find, based on the record as a whole, that Applicant did not show that Mr. Lemonis is known to potential purchasers of shirts and sweat shirts in the general public as "Trust the Process."

In the final analysis, even if both Applicant and Mr. Lemonis were known in their respective professions as "Trust the Process," the record does not show that consumers would associate the mark TRUST THE PROCESS only with them for the respective non-souvenir general consumer goods identified in the cited registration and the application, or that consumers would differentiate the source of the non-souvenir consumer goods sold under the two TRUST THE PROCESS marks based on their respective owners.

---

mantra throughout sports history that is more synonymous with a team's culture and identity than 'Trust the Process' is to the Philadelphia 76ers"); July 15, 2019 Office Action at TSDR 9-17 (describing and displaying Applicant's hashtag use of #Trust the Process on Twitter); July 31, 2020 Request for Reconsideration at TSDR 106-07 (stating that "'trust the process' is commonly associated with . . . Hinkie's patience-required approach to building the team — which resulted in three years of dismal losing and suffering setback after setback"), 135-38 (stating that "Hinkie came to honor a three-word phrase – 'trust the process' – which came to symbolize his controversial methods in Philly.").

The record also does not support Applicant's argument that "[e]ven marks that are identical in sound and appearance may create sufficiently different commercial impressions **when applied to the respective parties' goods or services**," 6 TTABVUE 10 (emphasis in original), which relies on the *Sears, Roebuck & Co.*, *British Bulldog*, and *Sydel Lingerie* cases noted above. Unlike in those cases, there is no evidence here, or other reason to find, that the mark TRUST THE PROCESS has one meaning when used with shoes, and a second and different meaning when used with shirts and sweatshirts, based on the nature of the respective goods. *Cf. Coach Servs.*, 101 USPQ2d at 1721 ("Opposer's COACH mark, when applied to fashion accessories, is clearly either arbitrary or suggestive of carriage or travel accommodations (e.g., stagecoach, train, motor coach, etc.), thereby engendering the commercial impression of a traveling bag (e.g., a coach or carriage bag). On the other hand, applicant's COACH marks call to mind a tutor who prepares a student for an examination.").

Applicant "does not, and cannot, dispute that the mark [TRUST THE PROCESS] in standard character form, and [Registrant's mark TRUST THE PROCESS] in standard character . . . form, are pronounced the same way," *i.am.symbolic*, 123 USPQ2d at 1748, and he "did not establish . . . that [TRUST THE PROCESS] when applied to [Applicant's] goods 'brings to mind' something different from [TRUST THE PROCESS] when applied to [Registrant's] mark[ ]." *Id.* at 1749 (quoting *Coach Servs.*, 101 USPQ2d at 1721). Our finding under the first *DuPont* factor is thus a slam dunk because Applicant's and Registrant's TRUST THE PROCESS marks "are identical in

appearance, sound, connotation, and commercial impression," *In re Country Oven*, 2019 USPQ2d 443903, at *3 (TTAB 2019), and "the first *DuPont* factor 'weighs heavily' in favor of a likelihood of confusion." *i.am.symbolic*, 123 USPQ2d at 1748 (quoting *In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003) (explaining that "when word marks are identical but neither suggestive nor descriptive of the goods associated with them, the first *DuPont* factor weighs heavily against the applicant.")).

### B.    Similarity or Dissimilarity of the Goods and Channels of Trade

The second *DuPont* factor "considers '[t]he similarity or dissimilarity and nature of the goods or services as described in an application or registration," *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1051 (Fed. Cir 2018) (quoting *DuPont*, 177 USPQ at 567*)*, while the third *DuPont* factor considers "the similarity or dissimilarity of established, likely-to-continue trade channels.'" *Id.* at 1052 (quoting *DuPont*, 177 USPQ at 567). *See also Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161-63 (Fed. Cir. 2014).

The goods need not be identical, but "need only be related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Servs.*, 101 USPQ2d at 1722 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)).

> Evidence of relatedness may include news articles or evidence from computer databases showing that the relevant goods are used together or used by the same purchasers; advertisements showing that the relevant

goods are advertised together or sold by the same manufacturer or dealer; or copies of prior use-based registrations of the same mark for both applicant's goods and the goods listed in the cited registration.

*In re Ox Paperboard, LLC*, 2020 USPQ2d 10878, at \*5 (TTAB 2020) (citing *Davia*, 110 USPQ2d at 1817); *accord Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (evidence that "a single company sells the goods and services of both parties, if presented, is relevant to a relatedness analysis").

"[B]ecause the marks are identical, the degree of similarity between the goods . . . required for confusion to be likely declines." *DeVivo v. Ortiz*, 2020 USPQ2d 10153, at \*11 (TTAB 2020) (citing *Orange Bang, Inc. v. Olé Mexican Foods, Inc.*, 116 USPQ2d 1102, 1117 (TTAB 2015)). *See also Country Oven*, 2019 USPQ2d 443903, at \*5.

Applicant claims that his "shoes are highly dissimilar from Registrant's shirt[s] and sweatshirts, such that consumer confusion will not arise." 6 TTABVUE 11. He applies a full-court press on this factor and advances multiple arguments in support of this claim, which we summarize below.

First, he argues that the "goods are not even complementary or companion items that would be sold or displayed together." *Id.*

Second, he argues that

> when taken in the context of the marks and their owners, it is **highly** unlikely that Registrant or Applicant's purchasers would buy the other's goods given the well-known unique nature of Applicant and Registrant. Registrant's purchasers are highly unlikely to purchase Registrant's promotional clothing without being aware of Marcus Lemonis is [sic] the source, as the clothing is in promotion of his business and financial methodology and

> advice. Similarly, Applicant's consumers are highly unlikely to purchase his shoes without being aware of the connection to Joel Embiid. Therefore, consumers will be very familiar with the source of the goods prior to purchase, as they are buying the goods to show their support [of] Marcus Lemonis or Joel Embiid as the source of the respective goods, ensuring confusion will not result.

*Id.* at 11-12 (emphasis in original).

Third, he argues that the Examining Attorney's third-party registration and Internet evidence of relatedness is flawed because it focuses on house marks, which he argues "may be licensed for a broader range of unrelated goods and services," which "may be of less probative value to show that goods are related." *Id.* at 12-13. In support of these arguments, he cites a non-precedential decision, *In re Marko Schuhfabrik GmbH*, Serial No. 79040612 (TTAB Dec. 23, 2009), and three precedential cases, *In re Donnay Int'l, S.A.*, 31 USPQ2d 1953 (TTAB 1994), *Helene Curtis Indus. Inc. v. Suave Shoe Corp.*, 13 USPQ2d 1618 (TTAB 1989), and *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467 (TTAB 1988). *Id.*

Fourth, he argues that

> while noting that clothing items are "undeniably related goods," the Board has repeatedly held that the fact that different items of apparel "may be found in some of the same types of stores, such as department stores and similar establishments, which house a wide variety of products from different manufacturers within an industry as well as products from diverse industries, while relevant in a Section 2(d) situation, is not controlling thereon."

*Id.* at 14 (quoting *Sydel Lingerie*, 197 USPQ at 630).

Fifth, he argues that

> it cannot be reasonably disputed that Applicant's shoes and the cited registration's clothing are used for completely and

> entirely different purposes and obviously would not be substitutes for one another. A consumer would not generally wear shirts or sweatshirts around their feet, nor would a consumer be able to wear shoes as clothing and to protect the upper body from the elements. On the contrary, these products are sold for entirely different purposes, though generally within the retail industry.

*Id.* at 15.

The Examining Attorney responds that "Applicant's goods, namely, 'shoes,' are highly related to the registrant's goods, namely, 'clothing, namely, shirts and sweat shirts' because the goods of both parties consist of clothing items," which "travel in the same channels of trade to the same consumers, such that confusion as to source is likely," 8 TTABVUE 10, and that the Board has found "many different types of apparel to be related goods." *Id.* She further argues that

> neither the application nor the registration contains any limitations regarding trade channels for the goods and therefore it is assumed that registrant's and applicant's goods are sold everywhere that is normal for such items, i.e., clothing and department stores. Thus, it can also be assumed that the same classes of purchasers shop for these items and that consumers are accustomed to seeing them sold under the same or similar marks.

*Id.* She rejects Applicant's arguments regarding the actual nature and sellers of the involved goods on the ground that "determining likelihood of confusion is based on the description of the goods stated in the application and registration at issue, not on extrinsic evidence of actual use." *Id.* at 11.

The Examining Attorney also rejects Applicant's argument that her showing of relatedness depends on goods sold under house marks, noting that the Internet evidence is "from companies that predominantly sell clothing items, namely, GAP,

Banana Republic, Lands' End, LL Bean, The North Face, Eddie Bauer, etc.," *id.* at 13, and arguing that the third-party registration evidence "show[s] that the goods are of a kind that may emanate from a single source under a single mark." *Id.*

We begin our analysis of the second *DuPont* factor by noting the limited utility of reliance, in lieu of supporting evidence, on past decisions in which the Board has or has not found various clothing items to be related. Although "at one time there existed what might be called a 'per se' rule to the effect that the use of the same or similar marks on different items of wearing apparel was likely to cause confusion," *British Bulldog*, 224 USPQ at 855-56 (citations omitted), that has not been the case for more than 40 years. *See Sydel Lingerie*, 197 USPQ at 630 (noting that such a per se rule "would be contrary to the principle of trademark law that each case must be decided on the basis of the relevant facts . . . ."); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1207.01(a)(1) ("The facts of each case vary . . . therefore, there can be no rule that certain goods or services are per se related . . . ."). By the same token, the fact that particular clothing items were found not to be related in past decisions involving different marks and records does not compel such a finding today if the evidence in a particular case shows otherwise. We must examine the record in this case to determine whether the particular clothing items at issue are related.

In making that determination, we must consider the goods as they are identified in the involved application and registration because

> [a]pplicants have the option of tailoring their applications so that the registrations that ultimately issue will more closely reflect market realities: they may identify their goods with greater specificity, indicate a specific use for

which the goods are specialized, identify the types of purchasers who use the goods, indicate a price range, specify any trade channels to which their marketing activities may be restricted, and describe any specific circumstances that will necessarily attend the sale of the goods. However, where an application contains no such restrictions, examining attorneys and the Board must read the application to cover all goods of the type identified, to be marketed through all normal trade channels, and to be offered to all normal customers therefor. To do otherwise "would be improper because the [goods] recited in the application determine the scope of the post-grant benefit of registration. . . . It would make little sense for the Board to consider only the parties' current activities when the intent-to-use application, not current use, determines the scope of this post-grant benefit." *Stone Lion*, 110 USPQ2d at 1162-63 (citing *Octocom Sys. Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1788 (Fed. Cir. 1990)). Parties that choose to use identifications of goods in their trademark applications that are broader than their actual goods will be held to the broader scope of the application. *See Stone Lion*, 110 USPQ2d at 1162.

*In re FCA US LLC*, 126 USPQ2d 1214, 1217 (TTAB 2018), *aff'd mem.*, 778 F. App'x 962 (Fed. Cir. 2019).

Applicant took none of the steps discussed in *FCA US* to tailor his broad identification of goods to "more closely reflect market realities," *id.*, regarding his particular shoes. Indeed, neither identification contains any limitation regarding the nature of the identified goods, or their channels of trade or classes of consumers, that would make a material difference in our analysis, so we must presume that Applicant's "shoes" and Registrant's "shirts and sweat shirts" include "all goods of the type identified, without limitation as to their nature or price," *Sock It to Me*, 2020 USPQ2d 10611, at *8, and that those ubiquitous, everyday products "are offered to all the normal potential consumers for those goods, which would include not only"

Applicant's fans and fans of Registrant's television show, "but all members of the general public." *New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *16 (TTAB 2020).[37]

We agree with the Examining Attorney that because there are no restrictions in the goods identifications in either the application or the cited registration, we may not "import restrictions into the identification[s] based on alleged real world conditions" of the sort argued by Applicant, *id.* (citing *Stone Lion*, 110 USPQ2d at 1162),[38] or consider extrinsic evidence regarding Applicant and Registrant themselves.[39]

The Examining Attorney made of record webpages from three clothing companies that offer "shoes," and "shirts" or "sweat shirts," under the same mark,[40] as well as more than 20 third-party, use-based registrations of marks covering both sets of

---

[37] Even if Applicant had included a restriction purporting to link his shoes with himself, the Federal Circuit's analysis of the second *DuPont* factor in *i.am.symbolic* teaches that such a limitation does not amount to "a meaningful limitation." *i.am.symbolic*, 123 USPQ2d at 1748.

[38] As the Board noted in *FCA US*, "[i]n innumerable cases, the Board hears arguments about how the parties' *actual* goods, services, customers, trade channels, and conditions of sale are narrower or different from the goods and services identified in the applications and registrations," but "as stated in equally innumerable decisions of our primary reviewing court, we may consider any such restrictions only if they are included in the identification of goods or services." *FCA US*, 126 USPQ2d at 1217 n.18 (emphasis in original).

[39] Applicant's fifth argument that a "consumer would not generally wear shirts or sweatshirts around their feet, nor would a consumer be able to wear shoes as clothing and to protect the upper body from the elements," 6 TTABVUE 15, is certainly correct, but the "issue is not whether purchasers would confuse the goods, but rather whether there is a likelihood of confusion as to the source of these goods." *Ox Paperboard*, 2020 USPQ2d 10878, at *5 (citations omitted).

[40] January 31, 2020 Final Office Action at TSDR 39-170.

goods.[41] The record also includes Applicant's own evidence of webpages that offer shoes, t-shirts, and sweat shirts under the Nike marks,[42] and the Adidas mark,[43] and USPTO electronic records regarding his Registration No. 5753189 of the mark THE PROCESS for, inter alia, "shirts," "sweatshirts," and "flip flops," and his allowed application Serial No. 88108956 to register THE PROCESS for, inter alia, "Athletic footwear" and "casual footwear," and "sweatsuits."[44] This is evidence that consumers are accustomed to seeing shoes and clothes sold under the same mark, which in turn increases the likelihood of confusion. *See, e.g.*, *Detroit Athletic Co.*, 128 USPQ2d at 1051; *Hewlett-Packard Co.*, 62 USPQ2d at 1004. Indeed, as early as 60 years ago. the Federal Circuit's predecessor court noted that commercial diversification had led to companies offering footwear and clothing items under the same mark. *See Gen. Shoe Corp. v. Hollywood-Maxwell Co.*, 277 F.2d 169, 125 USPQ 443, 444-45 (CCPA 1960); *see also In re Keller, Heumann & Thompson Co.*, 81 F.2d 399, 28 USPQ 221, 223 (CCPA 1936).[45]

Moreover, contrary to Applicant's third and fourth arguments, the evidence of relatedness here shows sales of shoes and clothing under one mark by a variety of

---

[41] December 21, 2018 Office Action at TSDR 11-29; January 31, 2020 Final Office Action at TSDR 2-20, 24-38, 174-93.

[42] June 21, 2019 Response to Office Action at TSDR 67.

[43] *Id.* at TSDR 79.

[44] *Id.* at TSDR 322-51.

[45] The Internet evidence, including Applicant's own, refutes Applicant's first argument that shoes, and shirts and sweat shirts, are not "complementary or companion items that would be sold or displayed together." 6 TTABVUE 11.

companies.[46] The record as a whole is more than sufficient to convince us that "shoes," and "shirts and sweat shirts," are related, particularly given the reduced degree of similarity between the goods that is necessary for confusion to be likely arising from the fact that they are sold under identical marks. The second *DuPont* factor supports a finding of a likelihood of confusion.

Applicant next reiterates his argument that "[b]ecause the goods and services [sic] at issue are distinct and sold by unique, well-known individuals, the channels of trade and ultimate customer for these services [sic] are also inherently distinct and do not overlap **at all**." 6 TTABVUE 15 (emphasis in original). "Simply put, the fan base of Applicant Joel Embiid and potential consumers of Joel Embiid's shoes are drastically different from Registrant Marcus Lemonis's promotional clothing sold only in connection with his business ventures and advice regarding finances." *Id.* This argument is meritless because, like Applicant's arguments under the first and second *DuPont* factors, it improperly relies on matters outside the four corners of the application and the cited registration.

The channels of trade and classes of consumers for the goods identified in the application and in the cited registration are not restricted to "the fan base of

---

[46] The four cases cited by Applicant in support of this claim, 6 TTABVUE 14, are distinguishable. In *Donnay*, there were only two third-party registrations, a showing insufficient to show a relationship between soccer balls and rackets and bags for racket sports. *Donnay*, 31 USPQ2d at 1955. *Helene Curtis* found that although shoes and hair care products were "different," they were related for likelihood of confusion purposes. *Helene Curtis*, 13 USPQ2d at 1623-24. In *Mucky Duck Mustard*, the Board found that mustard and restaurant services were related. *Mucky Duck Mustard*, 6 USPQ2d at 1470 n.6. Finally, in *Marko Schuhfabrik*, a non-binding non-precedential decision, there was evidence from only "four large retailers showing applicant's and registrant's types of goods marketed under a common house mark." 14 TTABVUE 8 (Serial No. 79040612).

Applicant Joel Embiid and potential consumers of Joel Embiid's shoes" or "promotional clothing sold only in connection with [Marcus Lemonis's] business ventures and advice regarding finances." "'[A]bsent any explicit restriction in the application or registration, we must presume the . . . identified goods to travel through all normal channels of trade for goods of the type identified, and we must consider them to be offered and sold to all of the usual customers for such goods.'" *DeVivo*, 2020 USPQ2d 10153, at *13-14 (quoting *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1825-26 (TTAB 2015)). By their nature, shoes, shirts, and sweatshirts are "general consumer goods" that are "marketed to the general population," *id.* at *14, and that are purchased or used in some form by virtually everyone. The record shows that shoes and shirts are sold together on the websites of clothing companies, and have been registered under a single mark by numerous apparel businesses. The channels of trade and classes of customers plainly overlap, and this supports a finding of a likelihood of confusion.

## C.   Purchasing Conditions and Consumer Sophistication

The fourth *DuPont* factor also considers "[t]he conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 177 USPQ at 567. Applicant captions a section of his arguments in his appeal brief with the language of the fourth factor, 6 TTABVUE 17, but focuses in the body of his arguments on the extrinsic evidence regarding the circumstances of the purchase of the goods that he discusses under the first, second, and third *DuPont* factors. *Id.* at 17-20. His only reference to consumer sophistication per se is his citation of *Indus.*

*Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386 (CCPA 1973), for the proposition that "where 'parties sell their goods to discriminating purchasers under conditions calculated to ensure care in discerning the source or origin of the goods,' confusion is not likely." 6 TTABVUE 18-19 (quoting *Indus. Nucleonics*, 177 USPQ at 387).

*Indus. Nucleonics* does not support Applicant's arguments. The highly-technical goods at issue in that case were by their nature subject to careful, discriminating purchasing by professional buyers, and were not "off-the-shelf items purchased by all manner of people." *Indus. Nucleonics*, 177 USPQ at 387. Here, by contrast, the identifications of "shoes," "shirts," and "sweat shirts" encompass "all goods of the type identified, without limitation as to their nature or price," *Sock It to Me*, 2020 USPQ2d 10611, at *8, which include "off-the-shelf items purchased by all manner of people," *Indus. Nucleonics*, 177 USPQ at 387,[47] and worn by virtually everyone. *See Sock It to Me*, 2020 USPQ2d 10611, at *7-8 (goods identified as "socks" are purchased by general consumers and encompass "socks that are relatively inexpensive" and may be subject

---

[47] Applicant argues in the portion of his appeal brief directed to the second *DuPont* factor that "shoes are purchased after careful consideration with the help of a salesperson, just like in *British Bulldog*." 6 TTABVUE 11. This argument illustrates the danger in relying on past decisions, without supporting evidence, to establish current marketing practices. *British Bulldog* was decided in 1984, before the commercial Internet existed and long before it became an everyday means to purchase goods without entering a retail store. Webpages made of record by both the Examining Attorney and Applicant display a wide variety of shoes that may be purchased online directly from the vendor without the involvement of a salesperson. January 31, 2020 Final Office Action at TSDR 74-75, 117-55, 164-69; June 21, 2019 Response to Office Action at TSDR 67, 69, 71, 75, 77, 79; July 31, 2020 Request for Reconsideration at TSDR 34, 37-38, 40, 43, 46. There is no countervailing evidence to support Applicant's arguments that the sales practice discussed in *British Bulldog* remains the rule today and that shoes are purchased with anything more than an ordinary degree of care.

to impulse purchases). *See also In re Bercut-Vandervoort & Co.,* 229 USPQ 763, 764 (TTAB 1986) (evidence that relevant goods are expensive wines sold to discriminating purchasers must be disregarded given the absence of any such restrictions in the application or registration). Moreover, this argument does not take into account possible post-sale confusion, *see, e.g., HRL Assocs. Inc. v. Weiss Assocs. Inc.*, 12 USPQ2d 1819, (TTAB 1989), *aff'd*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990); *In re Artic Elecs. Co.*, 220 USPQ 836, 838 (TTAB 1983), which, in this case, is a relevant concern. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 27 USPQ2d 1516, 1519-20 (Fed. Cir. 1993) (finding post-sale confusion to be a valid concern in a shoe case).

We find that the purchaser care factor is neutral in our analysis of the likelihood of confusion.

### D. The Number and Nature of Similar Marks in Use on Similar Goods

The sixth *DuPont* factor "considers '[t]he number and nature of similar marks in use on similar goods.'" *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1693 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567). "The Federal Circuit has held that evidence of the extensive registration and use of a term by others can be powerful evidence of the term's weakness." *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1057 (TTAB 2017) (citing *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 12015) and *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir.

2015)). As discussed below, however, "while Applicant has submitted examples of third-party registrations, [he] has not submitted any current market evidence demonstrating that third parties are using similar marks on similar goods." *Sock It to Me*, 2020 USPQ2d 10611, at *9.

The third-party registrations, with no evidence of the extent of the use of the marks in commerce, do not diminish the commercial strength of Registrant's mark. "We have frequently said that little weight is to be given such [third-party] registrations in evaluating whether there is likelihood of confusion. The existence of these registrations is not evidence of what happens in the market place or that customers are familiar with them . . . .'" *Id.* (quoting *AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973), *quoted in Inn at St. John's*, 126 USPQ2d at 1746). Applicant's citation of third-party registrations as evidence of marketplace weakness "'is unavailing because third-party registrations standing alone, are not evidence that the registered marks are in use on a commercial scale, let alone that consumers have become so accustomed to seeing them in the marketplace that they have learned to distinguish among them by minor differences." *Id.* (quoting *In re Morinaga Nyugyo K.K.*, 120 USPQ2d 1738, 1745 (TTAB 2016) (also citing *AMF*)).

Third-party registration evidence may have some probative value, however, because it "may bear on conceptual weakness if a term is commonly registered for similar goods or services." *Tao Licensing*, 125 USPQ2d at 1057. Third-party registrations are relevant in the manner of dictionary definitions "to prove that some

segment of the [marks] has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Juice Generation*, 115 USPQ2d at 1675 (internal quotation marks omitted). *See also Jack Wolfskin*, 116 USPQ2d at 1136.

Applicant argues in his appeal brief that "a review of the Principal Register as a whole reveals current peaceful coexistence of registrations for identical or substantially similar marks by separate entities for *shoes* and *clothing*." 6 TTABVUE 20 (emphasis in original). Applicant cites four "pairs" of registrations of identical or very similar marks for those goods owned by separate entities. We reproduce below a table from Applicant's appeal brief listing these registrations:

| Clothing | Shoes |
| --- | --- |
| **COBRA** | **COBRA & Design** |
| Reg. No. 1851522 | Reg. No. 3430870 |
| **IVY** | **IVY** |
| Reg. No. 1477775 | Reg. No. 1298914 |
| **SOLE** | **SOLE & Design** |
| Reg. No. 5308974 | Reg. No. 4731696 |
| **SOLE' & Design** | **SOLE & Design** |
| Reg. No. 1458421 | Reg. No. 4731696 |

*Id.*[48] Applicant's appeal brief also cites his own "allowed application for THE PROCESS for shoes that was not rejected in view of Registrant's TRUST THE

---

[48] July 31, 2020 Request for Reconsideration at TSDR 48-82. The Examining Attorney correctly notes that both registrations of IVY and Registration No. 1458421 of SOLÉ and design were cancelled for failure to file declarations of continuing use. 8 TTABVUE 17 (July 31, 2020 Request for Reconsideration at TSDR 57, 62, 72). "The existence of a cancelled registration—particularly one cancelled for failure to provide a declaration of continued use—does not tend to show that the cited mark is weak due to third-party use. A cancelled registration is only evidence that the registration issued and it does not carry any of the legal presumptions under Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b)." *Inn at St. John's*, 126 USPQ2d at 1745 (citations omitted). Simply put, "'dead' or cancelled registrations have no probative value at all." *In re Kysela Pere et Fils Ltd.*, 98 USPQ2d 1261, 1264 (TTAB 2011). We will thus consider only the subsisting pairs of COBRA and SOLE registrations.

Serial No. 88202890

PROCESS mark." *Id.* at 21.[49] He concludes that "because there are currently numerous pairs of registrations peacefully coexisting for shoes and clothing, and Applicant's own THE PROCESS is able to peacefully coexist with the cited registration, consumer confusion is not likely to occur." *Id.*

In his reply brief, Applicant refers to "a crowded field of 'The Process' marks on the Register for clothing," 10 TTABVUE 6, citing the file histories of third-party registrations of LIVE THE PROCESS for various clothing items, including "t-shirts" and "sweatshirts,"[50] RESPECT THE PROCESS for "T-shirts" and "Tank tops,"[51] and WE ARE THE PROCESS for various clothing items, including "Shirts" and "Sweatshirts,"[52] as well as the file histories of two allowed third-party applications to register THE PHANTOM OF THE PROCESS and PHANTOM OF THE PROCESS for "Footwear; Hats; Shirts; Sweatshirts,"[53] and one allowed third-party application to register HONOR THE PROCESS for various clothing items, including "shirts" and "footwear."[54] We consider only the third-party registrations in our analysis because "pending applications are evidence only that the applications were filed on a certain date . . . ." *Inn at St. John's*, 126 USPQ2d at 1745 (citations omitted).

---

[49] July 15, 2019 Office Action at TSDR 322-51.

[50] June 21, 2019 Response to Office Action at TSDR 81-146 (Registration No. 4756782).

[51] *Id.* at TSDR 179-216 (Registration No. 5171483).

[52] *Id.* at TSDR 352-72 (Registration No. 4342495).

[53] *Id.* at TSDR 147-78, 217-48 (Serial No. 87879218). These applications were filed and prosecuted by Applicant's counsel in this case.

[54] *Id.* at TSDR 373-442 (Serial No. 86824374).

The pairs of subsisting registrations in the table above do not show that an element of the cited TRUST THE PROCESS mark is conceptually weak because the registered COBRA and SOLE marks do not contain any such element. Applicant cites *In re G.B.I. Tile & Stone, Inc.*, 92 USPQ2d 1366 (TTAB 2009), for the proposition that "'[A]pplicants may submit sets of third-party registrations to suggest the opposite, i.e., that the Office has registered the same mark to different parties for the goods at issue,'" 6 TTABVUE 20 (quoting *G.B.I. Tile & Stone*, 92 USPQ2d at 1369-70), but the quoted language is taken entirely out of context. The Board noted in *G.B.I. Tile & Stone* that under the **second** *DuPont* factor, "third-party registrations can be used by the examining attorneys to suggest that the goods are related because the same party has registered a common mark for the goods at issue in a likelihood of confusion case," *id.* at 1369, and that "'applicants may submit sets of third-party registrations to suggest the opposite, i.e., that the Office has registered the same mark to different parties for the goods at issue,'" suggesting that the goods are not related. *Id.* at 1369-70.[55] The Board's discussion had nothing to do with the use of "sets of third-party registrations" to show that a segment of a mark was conceptually weak.

The use of "sets of third-party registrations" for that purpose was discussed and rejected in *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266 (TTAB 2009), which affirmed a Section 2(d) refusal to register the standard character mark VANTAGE TITAN for an MRI diagnostic apparatus over a registration of the standard character

---

[55] Applicant did not offer the "paired" registrations for this purpose, but they would be insufficient to overcome the Examining Attorney's evidence that the goods are related.

mark TITAN for a medical ultrasound device. The applicant "point[ed] to six pairs of registrations and argue[d] that the USPTO 'has allowed similar marks for MRI and ultrasound equipment,'" specifically PANACEA DISCOVERY/QUOSTIC PANACEA, AUTOALIGN/AUTOSOUND, MICROMAXX/NEOMAXX, OPTISON/OPTI-GO, QUALITY FOR LIFE/MADE FOR LIFE, and STARLINK/PRINTLINK. *Toshiba Med. Sys.*, 91 USPQ2d at 1272. The Board held that "'the third-party registrations relied on by applicant cannot justify the registration of another confusingly similar mark,'" *id.* (quoting *Plus Prods. v. Star-Kist Foods, Inc.*, 220 USPQ 541, 544 (TTAB 1983)), because each case must be decided independently of prior decisions, and that "the marks involved are so different from the present case that, even if they were relevant, they would merely stand for the principle that the Office determines each case on its own merits." *Id.*[56] The "paired" COBRA and SOLE marks here similarly are so different from the involved marks TRUST THE PROCESS as to have no probative value.

"Applicant has presented no evidence of third-party use, and at most, [three] third-party registrations" of PROCESS-formative marks for clothing,[57] which "is a far cry from the large quantum of evidence of third-party use and third-party registrations that was held to be significant in both" *Jack Wolfskin* and *Juice Generation. Inn at*

---

[56] We address below Applicant's arguments regarding consistency of examination.

[57] In addition, the LIVE THE PROCESS, RESPECT THE PROCESS, and WE ARE THE PROCESS marks differ from the involved TRUST THE PROCESS marks, which reduces their potency as evidence of conceptual weakness. *See Inn at St. John's*, 126 USPQ2d at 1744 (registrations of FIFTH DINING and FIFTH GROUP RESTAURANTS for restaurant services contained "non-identical terms" to the cited mark 5IVESTEAK for restaurant services and were thus of "varying probative value.").

*St. John's*, 126 USPQ2d at 1746. As noted above, because there is no evidence of use of PROCESS-formative marks in the marketplace, we find that the sixth *DuPont* factor is neutral in our analysis of the likelihood of confusion. We further find that the record does not show the cited mark TRUST THE PROCESS is conceptually weak and we accord it the normal scope of protection.

### E. Absence of Evidence of Actual Confusion

The eighth *DuPont* factor considers "the length of time during and conditions under which there has been concurrent use without evidence of actual confusion." *In re Guild Mortg. Co.*, 2020 USPQ2d 10279, at \*6 (TTAB 2020) (quoting *DuPont*, 177 USPQ at 567). Generally, this factor is not that important in ex parte cases unless the applicant provides us with contextual evidence that allows us to meaningfully assess the length of time and degree to which the applicant's and registrant's commercial activities would have provided an opportunity for confusion to have manifested itself if it were likely. *See id.,* at \*8. In *Guild Mortg.*, the Board held that unlike other *DuPont* factors, the eighth factor "requires us to look at **actual market conditions**, to the extent there is evidence of such conditions of record." *Id.* (emphasis in original). Applicant acknowledges as much in his reply brief. 10 TTABVUE 6 n.2.

Applicant argues in his appeal brief that his "TRUST THE PROCESS [mark] and the cited registration have peacefully coexisted for almost **five years** in interstate commerce without a single instance of consumer confusion." 6 TTABVUE 21 (emphasis in original). Applicant claims that "TRUST THE PROCESS has been used

by Applicant since at least November of 2014." *Id.* He cites Exhibit I to his Request for Reconsideration in an apparent reference to the following tweet, which is similar to one that we discussed above in the Background section:



This tweet is not illustrative of use by Applicant of TRUST THE PROCESS in connection with shoes, or any other sort of trademark use, but is instead merely encouragement to his Twitter followers to be optimistic about the future of the Philadelphia 76ers under then-General Manager Hinkie. Indeed, there is a similar precatory use of the phrase "trust the process" by another person almost five months earlier in a tweet that appears on the same page in the record and that we discussed above as well:



Other than the argument of Applicant's counsel, which is "no substitute for evidence," *In re OEP Enters. Inc.*, 2019 USPQ2d 309323, at *46 (TTAB 2019) (quoting

---

[58] July 31, 2020 Request for Reconsideration at TSDR 97.

[59] *Id.*

*Cai*, 127 USPQ2d at 1799), there is no proof of how, how long, and to what extent Applicant's claimed TRUST THE PROCESS mark has been used "in interstate commerce" or otherwise, or indeed whether it has been used at all.[60] The "absence of any reported instances of actual confusion would be meaningful only if the record indicated appreciable and continuous use by [A]pplicant of [his] mark for a significant period of time in the same markets as those served by [Registrant] under its mark[]." *Gillette Can. Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). The record here is devoid of "evidence of such conditions." *Guild Mortg.*, 2020 USPQ2d 10279, at *6.[61] We find that the eighth *DuPont* factor is neutral in our analysis of the likelihood of confusion.

## F.   Other Established Facts Probative of the Effect of Use

The thirteenth, "catchall" *DuPont* factor "pertains to 'any other established fact probative of the effect of use,'" *Country Oven*, 2019 USPQ2d 443903, at *15, and "'accommodates the need for flexibility in assessing each unique set of facts . . . .'" *Id.* (quoting *In re Strategic Partners Inc.*, 102 USPQ2d 1397, 1399 (TTAB 2012)). "This

---

[60] Applicant filed his application in November 2018 based on his alleged intention to use the mark in commerce, and the application was not amended to allege use. Although Applicant's appeal brief refers in several places to "Applicant's shoes," 6 TTABVUE 11, 13, 15, there is no evidence of any use of TRUST THE PROCESS on shoes.

[61] In his reply brief, Applicant "submits that it [sic] has provided more than just uncorroborated statements," pointing to "a nearly identical registration (U.S. Reg. No. 5,753,180) coexisting with the cited registration without confusion claiming a first use date since December 18, 2018." 10 TTABVUE 6 n.2. Applicant claims that "[a]t the very least, this conclusively establishes the ability of Applicant's mark to coexist with the cited registration and uncontroverted evidence of coexistence for at least over two years under the eighth *du Pont* factor." *Id.* The existence of this registration of the mark THE PROCESS for various clothing items has no probative value under the eighth *DuPont* factor, but we discuss it immediately below under the thirteenth *DuPont* factor.

includes a variety of circumstances, such as the coexistence of an applicant's prior-registered mark with the cited registration. Where an applicant owns a prior registration and the mark is 'substantially the same' as in the applied-for application, this can weigh against finding that there is a likelihood of confusion." *Id.* (citing *Inn at St. John's*, 126 USPQ2d at 1748 (internal citation omitted)).

Applicant argues in his reply brief that the fact that "a nearly identical mark owned by Applicant can peacefully coexist in the same Class and for overlapping goods as the cited registration is highly persuasive evidence that the current application can also peacefully coexist." 10 TTABVUE 6. Applicant cites *Strategic Partners* for the proposition that a "prior registration for [a] similar mark and similar goods can overcome potential similarity under [the] thirteenth factor of the *du Pont* analysis," *id.,* and argues that his "prior ownership of U.S. Reg. No. 5,753,180 for the virtually identical mark THE PROCESS for identical goods is dispositive and demonstrates that confusion between Applicant and Registrant is not likely." *Id.* at 7.

The Examining Attorney argues that *Strategic Partners* involved a

> unique set of facts: (1) the marks in applicant's prior registration and application were virtually identical ("no meaningful difference" existed between them, such that they were "substantially similar"); (2) the goods were identical in part; and (3) the prior registration had co-existed for at least five years with the cited registration (both being more than five years old and thus immune from attack on likelihood of confusion grounds).

8 TTABVUE 18. She contends that in *Strategic Partners*, the "Board acknowledged these facts constituted a 'unique situation,' such that an applicant's prior registration

would generally need to fit within these precise parameters to overcome a Section 2(d) refusal." *Id.* (citing *Strategic Partners*, 102 USPQ2d at 1400; *In re USA Warriors Ice Hockey Program, Inc.*, 122 USPQ2d 1790, 1793-94 (TTAB 2017); and TMEP Section 1207.01). According to the Examining Attorney, Applicant's "current situation does not correspond to the facts set forth in" *Strategic Partners* because he "owns a prior filed application and not a prior registration, and the goods at issue are not identical." *Id.*

Although the Examining Attorney correctly describes the requirements for invoking the thirteenth *DuPont* factor set forth in *Strategic Partners*, her application of the case to the facts here ignores Applicant's ownership of prior Registration No. 5753180 of the mark THE PROCESS for "Apparel, namely, shirts, sweatshirts, shorts, sweatpants, hats, flip flops,"[62] not merely a "prior filed application." *Id.*[63]

Unlike in *Strategic Partners*, however, where there was no "meaningful difference" between the applied-for mark ANYWEAR in slightly stylized form and the applicant's registered standard character mark ANYWEARS, *Strategic Partners*, 102 USPQ2d at 1399, and the applicant's prior registration was not vulnerable to

---

[62] July 31, 2020 Request for Reconsideration at TSDR 84.

[63] The Examining Attorney's error may be the result of Applicant's own error in his appeal brief, in which he refers to "an allowed application for THE PROCESS for *shoes* that was not rejected in view of Registrant's TRUST THE PROCESS mark," 6 TTABVUE 21 (emphasis in original), an apparent reference to his allowed Application Serial No. 88108956, rather than to Registration 5753180, which he discusses in his reply brief. 10 TTABVUE 6. Applicant's error is less explicable, however, because his appeal brief cites Exhibit H to his Request for Reconsideration, which consists of USPTO electronic records regarding his registration, July 31, 2020 Request for Reconsideration at TSDR 83-88, which issued on May 14, 2019, long before the filing of Applicant's appeal brief in October 2020.

cancellation under Section 2(d) because it had been on the Principal Register for more than five years, there are meaningful differences between Applicant's registered mark THE PROCESS mark and his applied-for mark TRUST THE PROCESS, and Applicant's mark THE PROCESS has been registered for fewer than five years and accordingly "may still be challenged in a cancellation proceeding under Section 2(d)." *Country Oven*, 2019 USPQ2d 443903, at *18. The thirteenth *DuPont* "factor is highly fact specific and it is under very specific circumstances that this factor may matter," *id.*, and "those circumstances do not exist here." *Id.* The thirteenth *DuPont* factor is neutral in our analysis of the likelihood of confusion.

## G.   Applicant's Argument Regarding Consistency of Examination

Finally, Applicant hoists up a hoped-for buzzer-beater, arguing that "there is a strong public policy in favor of consistency of decisions," 6 TTABVUE 21, and pointing out "that the Trademark Office deemed Applicant's Class 25 filing for THE PROCESS to be sufficiently distinct from the cited registration's clothing." *Id.* This argument is an airball. As discussed immediately above, there is a meaningful difference between the marks THE PROCESS and TRUST THE PROCESS, and our decision here is not inconsistent with Applicant's prior registration of THE PROCESS. Even if it were, however, the Board has made clear that "'[w]hile we recognize that consistency is highly desirable . . . consistency in examination is not itself a substantive rule of trademark law, and a desire for consistency with the decisions of prior examining attorneys must yield to proper determinations under the Trademark Act and rules.'" *In re Ala. Tourism Dep't*, 2020 USPQ2d 10485, at *11 (TTAB 2020) (quoting *In re Am.*

*Furniture Warehouse Co.*, 126 USPQ2d 1400, 1407 (TTAB 2018) (internal quotations omitted)). Our conclusion below that there is a likelihood of confusion in this case is "the decision required under the statute on the record before us." *Id.*

### H.    Summary

The first, second, and third *DuPont* factors support a finding of a likelihood of confusion, and the fourth, sixth, eighth, and thirteenth factors are neutral. The TRUST THE PROCESS marks are identical in appearance, sound, and connotation and commercial impression, which reduces the degree of similarity between the goods necessary for confusion to be likely; the record shows a sufficient degree of relatedness of shoes, and shirts and sweat shirts; and those goods are sold through overlapping channels of trade and are purchased and used by members of the general public. We find, based on the record as a whole, that Applicant's mark TRUST THE PROCESS for "shoes" so resembles the registered standard character mark TRUST THE PROCESS for "Clothing, namely, shirts and sweat shirts" as to be likely, when used in connection with the goods identified in the application, to cause confusion, to cause mistake, or to deceive.

**Decision**: The refusal to register is affirmed.